IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


| | | |
|---|---|---|
| JUDITH K. KERNS, MARCIA NALLEY, | ) | |
| and SANDRA L. STEWART, | ) | |
| on behalf of themselves and a similarly | ) | |
| situated class, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:06-cv-01113 |
| | ) | District Judge Trauger |
| v. | ) | Magistrate Judge Brown |
| | ) | |
| CATERPILLAR, INC., | ) | Class Action |
| | ) | |
| Defendant. | ) | |


## MEMORANDUM

Currently pending before the court is a motion to dismiss by the defendant (Docket No. 42), the plaintiffs' response thereto (Docket No. 50), and the defendant's reply to that response (Docket No. 56). For the reasons explained herein, the defendant's motion will be DENIED.

I.    Introduction

This is an action for vested lifetime health care benefits. The plaintiffs are surviving spouses of former employees of Caterpillar, Inc. ("Caterpillar") who retired on or after March 16, 1998 and before January 10, 2005. According to the plaintiffs, this lawsuit was precipitated by Caterpillar's announcement in 2005 that, beginning in 2006, class members would be required to pay monthly premium sharing co-payments and that, effective in 2006, 2008, and 2010, Caterpillar was modifying the health care benefits, including making a series of increases to the prescription drug co-payments and imposing new deductibles and annual out-of-pocket

1

maximums paid by the class.

On April 13, 2006, the plaintiffs filed this action in the Western District of Tennessee (W.D. Tenn. Case No. 2:06-cv-2213). On September 29, 2006, the defendant filed a motion to dismiss. (W.D. Tenn. Docket No. 31). On November 9, 2006, the defendant filed a motion to transfer the case to the Central District of Illinois. (W.D. Tenn. Docket No. 36).

The Honorable Jon Phipps McCalla denied the defendant's motion to transfer by order entered November 9, 2006, and transferred the case to the Middle District of Tennessee, where a companion case, *Winnett v. Caterpillar, Inc.*, 3:06-cv-00235, is pending.[1] (W.D. Tenn. Docket No. 39). On November 30, 2006, the plaintiffs filed their response in opposition to the defendant's motion to dismiss. (Docket No. 50).

The plaintiffs seek relief under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and under § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, from the defendant Caterpillar for breach of a collective bargaining agreement ("CBA") and a welfare benefit plan.

The defendant provided health care benefits for the plaintiffs' spouses and the class pursuant to successive CBA's with the United Auto Workers ("UAW"). According to the plaintiffs, the parties to the CBA's intended for these health care benefits for surviving spouses to vest and to continue beyond the expiration of any particular contract. The plaintiffs claim that the defendant breached its promise to pay lifetime health benefits to surviving spouses at no cost when, in 2005, Caterpillar began charging surviving spouses for a portion of their medical care. The plaintiffs also complain they were charged increased co-payments for prescription drugs and

---

[1]The *Winnett* case has not been consolidated with the instant case.

2

other out-of-pocket expenses.

The plaintiffs seek declaratory judgment, preliminary and permanent injunctive relief requiring Caterpillar to maintain the level of health care benefits as required by the terms of the 1998 CBA, an order for the defendant to pay damages, plus interest, to the class for any losses suffered, an order for the defendant to pay damages for mental distress and anguish, an award of attorney's fees, punitive damages and costs, and any further relief. The plaintiffs also seek to represent a putative class under Federal Rule of Civil Procedure 23(a) and (b) consisting of surviving spouses of former hourly employees: (1) who were represented by the UAW in collective bargaining; (2) who retired from Caterpillar on or after March 16, 1998 and before January 10, 2005; and (3) whose employment at Caterpillar's facilities in Memphis, TN, York, PA, Denver, CO, and Aurora, Peoria, East Peoria, Mapleton, Mossville, Morton, Decatur and Pontiac, IL was governed by the Central Labor Agreements and the related CBA's. (Docket No. 60 at 1-2).

In its motion to dismiss, Caterpillar contends that the court lacks subject matter jurisdiction over the plaintiffs' LMRA and ERISA claims. (Docket No. 43 at 11-16). In addition, Caterpillar contends that the plaintiffs cannot maintain an action on behalf of a hypothetical group of "future" surviving spouses that cannot be readily identified. (Docket No. 43 at 16-18). Caterpillar also contends that the claims of current surviving spouses--i.e., those who became surviving spouses while the 1998 labor contracts were in effect--are moot. (Docket No. 43 at 18-20). Therefore, Caterpillar concludes, this case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

In response, the plaintiffs assert that the court has subject matter jurisdiction over this

3

suit; the plaintiffs' rights and the rights of the proposed class members vested under the 1998 Central Labor Agreement ("CLA") and previous contracts, regardless of the expiration of the 1998 agreements and regardless of the date the retiree died; that their proposed class consists only of present surviving spouses; and that the claims of those surviving spouses are not moot. (Docket No. 80).

II.     Facts

The facts are taken from the parties' briefs filed in connection with Caterpillar's motion to dismiss as well as those briefs submitted in connection with the plaintiffs' motion for class certification,  the evidence submitted in support of those briefs, and the Amended Complaint. Where facts are disputed, the court so notes.

A.      *The Caterpillar-UAW Collective Bargaining Relationship*

The Caterpillar-UAW bargaining relationship began with the UAW's 1948 certification as the union for Caterpillar employees in East Peoria, Illinois.  *(Aff. of David W. Stevens, ¶ 8, Docket No. 44).* Over time, Caterpillar's UAW bargaining relationship expanded to include employees at multiple facilities, primarily in Illinois.  *(Id.,* ¶¶ 9-10).  Eventually, Caterpillar and the UAW agreed to engage in multi-plant bargaining for most Caterpillar UAW-represented employees.  *(Id.* ¶ 9).  This came to be known as "Central Bargaining," and the resulting labor contracts included a CLA, and related local agreements and benefits agreements.  *(Id.)*

During the parties' nearly 60-year collective bargaining relationship, Caterpillar and the UAW have negotiated a series of labor contracts governing the terms and conditions of employment for the company's UAW-represented employees, including their retiree benefits. *(Id.,* ¶ 11).  As part of their bargaining relationship, the parties also have historically negotiated

4

changes in the benefits for existing retirees and their spouses, which have been uniformly acquiesced in by retirees, their dependents, and surviving spouses. (*Id.*)

B.      *Pre-1988 CLAs and SPDs*

Historically, medical benefits for retirees' surviving spouses have not been set forth in the CLA's themselves, but in separate Insurance Plan Agreements ("IPA's") and attached Group Insurance Plans ("GIP's"). These benefits were also described in the SPD's. (Ex. 3 to Docket No. 50, Aff. of James Richard Atwood at 6-9). According to James Richard Atwood, who is the administrative assistant to UAW International Vice President and Director and of the Ag Imp Department with respect to all matters relating to Caterpillar negotiations and contract administration, over the decades, these negotiated agreements and plans set forth a vested right to lifetime health care benefits for surviving spouses. (*Id.* ¶¶ 18, 21).

Section 5.15 on page 25 of the "1976 CLA Insurance Plan Agreement and Group Insurance Plan for 12/17/1976 (effective on the Monday following ratification) until 10/1/1979 CLA" ("1976 IPA") provides as to surviving spouses:

> [S]uch Dependents' Coverage will be continued following the death of a retired Employee for the remainder of his surviving spouse's life without cost.

(Ex. 10 to Docket No. 50). Section 6.2(c) on page 40 of the 1976 IPA provides as to surviving spouses:

> [S]uch Dependents' Coverage for any such surviving spouse . . . will continue in effect . . . for the remainder of her life without cost.

(*Id.*)

Section 5.15 on page 26 of the "1979 Benefit Plans and Agreements, UAW and Local

5

974 Insurance Program, Retirement Plan and Supplemental Unemployment Benefit Plan" ("1979 IPA") provides as to surviving spouses:

> [S]uch Dependents' Coverage will be continued following the death of a retired Employee for the remainder of his surviving spouse's life without cost.

(Ex. 4 to Docket No. 50). Section 6.2(c) on pages 45-46 of the 1979 IPA provides as to surviving spouses:

> [S]uch Dependents' Coverage for any such surviving spouse . . . will continue in effect . . . for the remainder of her life without cost.

(*Id.*)

    C.    *The 1988-91 Insurance Benefits*

        1.    *The 1988 IPA and GIP*

The 1988 CLA, like the preceding CLA's, did not contain any language substantively providing or incorporating by reference any health insurance benefits, including retiree health care. (Aff. of David W. Stevens, ¶ 12, Docket No. 44). Rather, such benefits were set forth in the 1988 IPA between Caterpillar and the UAW, along with the appended 1988 GIP. *(Id.,* ¶ 12, Exs. 1-2).    The 1988 IPA was effective by its terms until October 1, 1991. (*Id.*, ¶ 12, Ex. 1, § 9.) Pursuant to Section 2 of the 1988 IPA, Caterpillar agreed to "continue to maintain for eligible Employees the Group Insurance Plan which was in effect on the day preceding the date…" of the 1988 IPA, subject to the amendments outlined in the 1988 IPA. *(Id.,* ¶ 12, Ex. 1, § 2.) The 1988 IPA further provided that the "provisions of the Group Insurance Plan as in effect on September 30, 1988, shall continue in effect until amended pursuant to the foregoing and thereafter to the extent not amended pursuant to the foregoing." *(Id.,* ¶ 12, Ex. 1, § 3.) It further provided: "Termination of this Agreement shall not have the effect of automatically

6

terminating the Plan." (*Id.*, Ex. 1, § 9).

Section 2.1 of the 1988 GIP provided that Caterpillar would "maintain the Plan herein described…" and would "pay such part of the cost thereof as is not provided by Employee contributions…." (*Id.,* ¶ 12, Ex. 2, § 2.1). Section 5 of the 1988 GIP set forth provisions regarding active and retiree health care. (*Id.,* ¶ 12, Ex. 2, § 5.) As is relevant to this case, paragraph 5.1 provided that:

> A benefit shall be provided in accordance with this Section only for an Employee, while coverage for such benefit is in effect with respect to him, or a Dependent of an Employee, while Dependents' Coverage for such benefit is in effect with respect to such Employee. Benefits in accordance with this Section will be provided by his Employer without cost to the Employee except as otherwise provided in paragraph 6.1(a) *[Termination of Coverage]…*.

(*Id.,* ¶ 12, Ex. 2, § 5.1.).

With respect to retirees and surviving spouses, Section 5.15 on page 32 of the 1988 GIP provided:

> Retired Employees who satisfy the requirements hereinafter set forth shall be entitled to the same benefits provided in this Section V as if they were Employees. Coverage in accordance with this paragraph 5.15 shall be provided without cost to any such retired Employee. Such benefits to the extent provided in this paragraph 5.15 will be provided after his retirement from active service for a retired Employee if he has at least 5 years of credited service under the Non-Contributory Pension Plan at his retirement and is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan or would be eligible for such immediate commencement but for his election to defer commencement of his pension. Coverage shall take effect on his retirement date….

* * *

7

Dependents' Coverage shall be in effect in accordance with this paragraph 5.15 while Personal Coverage is in effect with respect to (a) all Dependents of a retired Employee who were covered hereunder on the day preceding his retirement and (b) any person who becomes a Dependent after the retirement of a retired Employee if such retired Employee either was covered for Dependents' Coverage prior to retirement or had no Dependents prior to retirement, and **such Dependents' Coverage will be continued following the death of a retired Employee for the remainder of his surviving spouse's life without cost**. For purposes of this paragraph 5.15 only, the terms "Employee" and "Employee's", wherever appearing in other sections hereof, shall be deemed to read "retired Employee" and "retired Employee's", respectively.

*(Id.,* ¶ 12, Ex. 2, ¶ 5.15)(emphasis added). Section 6.2(c) on page 56 provides as to surviving spouses:

[S]uch Dependents' Coverage for any such surviving spouse . . . will continue in effect . . . for the remainder of her life without cost.

*(Id.)*

2. *The 1988 SPD*

In addition to the above documents, UAW-represented employees were provided with a SPD (the "1988 SPD"). *(Id.,* ¶ 13, Ex. 3.) According to Caterpillar, as active employees during the term of the 1988 labor contracts, all of the named plaintiffs or their Caterpillar spouses would have received the 1988 SPD. *(Id.,* ¶ 13.) With respect to retiree medical benefits, the 1988 SPD advised active employees:

If you retire and are eligible for the immediate receipt of a pension (with at least 5 years of credited service) under the Non-

Contributory Pension Plan, you will be eligible for the Retired

8

Medical Benefit Plan, continued at no cost to you.

*(Id.,* ¶ 13, Ex. 3, p. 38.)

With respect to surviving spouse health insurance, the 1988 SPD stated:

> If an active employee dies when eligible to retire or if a retired
> employee dies, the surviving spouse will have coverage for his or
> her lifetime at no cost to the survivor.

*(Id.,* ¶ 13, Ex. 3, p. 36.)

Finally, the 1988 SPD contained the following "Plan Termination Provisions":

> Subject to the applicable collective bargaining agreements, the
> company reserves the right to terminate the employee benefit
> Plans. A Plan termination may result in the denial or loss of
> benefits that a participant or beneficiary might otherwise expect to
> receive.
>
> * * *
>
> **Insurance**
>
> If the Insurance Plan were to terminate, medical benefits would be
> payable only for services or materials received, and hospital
> confinements which commenced, prior to the date of termination;
> and disability benefits would be payable only for disabilities that
> commenced prior to such date.

*(Id.,* ¶ 13, Ex. 3, p. 98.)

    D.    *Expiration of the 1988 Labor Contracts and the 1992 Unilateral Implementations*

Prior to the expiration of the 1988 labor contracts, both Caterpillar and the UAW gave

notice in July 1991, pursuant to Section 8(d) of the National Labor Relations Act, of their intent

to terminate and negotiate modifications to the 1988 labor contracts, including the 1988 IPA.

*(Id.,* ¶ 14, Exs. 4-5.) Thereafter in the fall of 1991, Caterpillar and the UAW commenced

negotiations. *(Id.,* ¶ 15.) A labor dispute quickly emerged regarding acceptable terms for the

successor agreements. *(Id.)* Caterpillar's proposals included, *inter alia*: (a) the introduction of a

9

health care network, whereby active employees and retirees within a covered area would be required to receive services from an "in-network" provider, or else pay a defined percentage of the cost of the services; and (b) monetary limits or "caps" on the amounts Caterpillar would pay for future retiree health coverage. *(Id.,* ¶ 16.) Caterpillar and the UAW provided information regarding these proposals to represented employees. *(Id.,* ¶ 17, Exs. 6-7.)

On September 28, 1991, Caterpillar and the UAW agreed to extend the 1988 labor contracts. *(Id.,* ¶ 18.) This extension continued until midnight on November 3, 1991, when the UAW canceled the extension, terminated the 1988 labor contracts, and commenced a selective strike at certain CLA facilities.[2] *(Id.)*

By letter dated March 5, 1992, Caterpillar advised the UAW that it believed the parties' negotiations were at a legal impasse. *(Id.,* ¶ 20.) Thereafter, by letters dated March 31, 1992, Caterpillar advised the UAW and its UAW-represented employees that, effective April 6, 1992, the Company would unilaterally implement portions of its final contract offer. *(Id.,* ¶ 20, Exs. 9-10.) The terms to be implemented included the health care network provisions applicable to active and retired employees. *(Id.,* ¶ 20.)

---

[2]The only exception was at those CLA facilities covered by a separate agreement negotiated by Caterpillar and the UAW called the Caterpillar Logistics Services ("CLS") Agreement. *(Id.,* ¶ 19, Ex. 8.) The CLS Agreement continued the 1988 labor contracts for CLA employees working at a facility covered by the CLS Agreement until after the parties negotiated a successor labor agreement. *(Id.,* ¶ 19, Ex. 8, p. 5.) The record does not reflect at this time whether any members of the proposed Kerns class bear any relationship to the CLS Agreement.

10

E.    *The UAW's Response to Caterpillar's Implementation*

In response to Caterpillar's announcement, the UAW expanded the work stoppage

it had commenced in November 1991.  *(Id.,* ¶ 21.)   The UAW, disagreeing that Caterpillar had

the right to institute new terms of employment, also filed unfair labor practice charges with the

NLRB, alleging that Caterpillar's unilateral action violated § 8(a)(5) of the NLRA because

no lawful impasse existed in the parties' negotiations.  *(Id.,* ¶ 21.)   The NLRB investigated the

UAW's allegations and determined the charges had no merit.  *(Id.)*  Caterpillar then was entitled

to declare and unilaterally implement its proposed changes.  The UAW then withdrew the

charges.  *(Id.,* ¶ 21.)

While the UAW's charges were pending, it announced on April 14, 1992 that it

was recessing its work stoppage against Caterpillar and ordering its members back to work. *(Id.,*

¶ 22.)[3]

F.    *Caterpillar's Second Unilateral Implementation*

After the UAW recessed its strike and UAW-represented employees returned to

work under Caterpillar's implemented terms, the parties continued to negotiate over the terms of

successor labor contracts.  *(Id.,* ¶ 23.)  These negotiations during the remainder of 1992 did not

produce an agreement.  *(Id.)*  Accordingly, by letter dated November 20, 1992, Caterpillar

advised the UAW that, effective December 1, 1992, it would unilaterally implement additional

provisions of its final offer, including the above-described caps on the amount Caterpillar would

_____

[3]Relying on the Seventh Circuit's decision in  *McNealy v. Caterpillar Inc.,* 139 F.3d 1113,
1120-23 (7th Cir. 1998), the defendant contends that the UAW's action in this regard created an
implied-in-fact successor labor contract that included the terms Caterpillar implemented in 1992.
However, the plaintiffs argue that that decision was subsequently vacated by a 2000 NLRB ruling.
(Docket No. 113 at 6).

11

pay for future retiree health coverage for post-January 1, 1992 retirees. *(Id.,* ¶ 24; Ex. 11.) A summary of these changes was sent to all UAW-represented employees and affected retirees. *(Id.,* ¶ 25; Ex. 12-13.) Unlike the April 1992 implementation, the UAW did not file charges with the NLRB or otherwise seek to challenge the December 1992 implementation. *(Id.,* ¶ 26.)

Caterpillar's 1992 unilaterally implemented benefit plans documents set forth new provisions in Section 5.15 as to retirees who retire after January 1, 1992, and then set forth the old, prior lifetime language for surviving spouses:

> Effective for Employees retiring on and after January 1, 1992, the Company's maximum average annual cost per covered individual for retiree medical benefits . . . commencing January 1, 1999 shall be limited to the average annual cost per covered individual in 1997 projected to 1999.
>
> ***
>
> Retiree contributions toward coverage in each year after 1998 will be equal to the average annual cost per covered individual . . . in the second prior year . . . projected forward 2 years minus the limit on the Company's cost described above.
>
> ***
>
> [S]uch Dependents' Coverage will be continued following the death of a retired Employee for the remainder of his surviving spouse's life without cost.

(§ 5.15, pp. 37-38 of Ex. 6 to Docket No. 50). Section 6.2(c) on pages 68-69 provides as to surviving spouses:

> [S]uch Dependents' Coverage for any such surviving spouse . . . will continue in effect . . . for the remainder of her life without cost.

(Ex. 6 to Docket No. 50).

G.     *The 1998 CLA and Establishment of the VEBA*

12

Caterpillar and the UAW continued negotiations until March 1998, at which time they reached agreement on comprehensive successor labor contracts that incorporated, *inter alia*, the unilaterally implemented retiree health care provisions described above (i.e., the networks and the caps). *(Id., ¶ 27.)* Like the 1988 CLA, the new 1998 CLA did not contain any health insurance provisions. *(Id.)* Rather, the parties agreed to a new IPA (the "1998 IPA") with appended GIP (the "1998 GIP) that contained the amended provisions. *(Id., ¶ 27, Exs. 14-15.)* The 1998 labor contracts were ratified by Caterpillar's UAW-represented active employees, including the employee-spouses through whom the named plaintiffs derived their benefits as dependents. *(Id. ¶¶ 24-25.)*

The 1998 IPA was effective by its terms until April 1, 2004. (Ex. to Docket No. 50, § 9.) The 1998 IPA further provided that the "provisions of the Group Insurance Plan as in effect on September 30, 1991, shall continue in effect until amended pursuant to the foregoing and thereafter to the extent not amended pursuant to the foregoing." *(Id.* § 3.) It further provided: "Termination of this Agreement shall not have the effect of automatically terminating the Plan." *(Id.* § 9).

Pursuant to Section 2 of the 1998 IPA, Caterpillar would "maintain the Plan herein described…" and would "pay such part of the cost thereof as is not provided by Employee contributions…." *(Id.* § 2.1).

Under Section V, entitled "Medical Expense Benefits," Section 5.1 on page 38 of the

13

1998 IPA and GIP provides:

> A benefit shall be provided in accordance with this Section only
> for an Employee, while coverage for such benefit is in effect with
> respect to such Employee. Benefits in accordance with this
> Section will be provided to such Employee, retired Employee, and
> Dependents thereof for the duration of any Agreement to which
> this Plan is a part.

(Ex. 7 to Docket No. 50).

Section 5.15 on page 59 of the 1998 IPA and GIP provides the same language as before

the 1992 unilateral implementations:

> [S]uch Dependents' Coverage will be continued following the
> death of a retired Employee for the remainder of his surviving
> spouse's life without cost.

(Ex. 7 to Docket No. 50). Section 6.2(c) on page 104 provides as to surviving spouses:

> [S]uch Dependents' Coverage for any such surviving spouse . . .
> will continue in effect . . . for the remainder of her life without
> cost.

(*Id.*)

Concurrent with the above agreements, Caterpillar and the UAW also agreed to

contribute approximately $35 million in funds previously accrued for active employees under the

1988 CLA to a voluntary employee benefits association[4] ("VEBA"). (*Id.,* ¶ 30, Exs. 18-19.) The

VEBA was independent of Caterpillar and was created to pay expenses incurred by post-January

1, 1992 covered retirees and their dependents, over and above the caps implemented by

Caterpillar in 1992. (*Id.,* ¶¶ 30-31, Ex. 20.) Beyond agreeing to the redistribution of this

---

[4]*See* 26 U.S.C. § 501(c)(9) (VEBA is a tax-exempt program providing to members, their
dependents, or designated beneficiaries life, sick, accident, or other benefits "if no part of the net
earnings of such association inures (other than through such payments) to the benefit of any
private shareholder or individual.").

14

money, Caterpillar made no promise to provide any additional or future funding to the VEBA. *(Id., ¶ 30.)*

      H.    *The 2004 Labor Contracts*

By the time the 1998 labor contracts were nearing expiration, the money Caterpillar and the UAW had agreed to contribute to the VEBA was almost completely depleted. *(Id., ¶ 32.)* Accordingly, by letters dated December 2, 2002, September 2, 2003 and July 9, 2004, post-1991 retirees were advised that, consistent with the terms of the 1998 IPA and GIP, if and when the money in the VEBA was exhausted, the retirees could or would have to begin paying premiums in the amount of health care coverage costs that exceeded the caps. *(Id., ¶ 32; Exs. 21-23.)*

During this same time period, Caterpillar and the UAW commenced negotiations over successor labor contracts and eventually agreed upon terms of successor labor contracts on December 15, 2004. *(Id., ¶ 33.)* Once again, their agreement included an IPA (the "2004 IPA") and a GIP (the "2004 GIP"). *(Id.)* In pertinent part, Caterpillar and the UAW agreed that, rather than having retirees pay 100 percent of the costs of retiree health insurance above the caps (as had been previously established in 1992 and allegedly ratified in 1998), on a going forward basis, Caterpillar would share in the "above the cap" costs on a 40/60 basis. *(Id.)*

For the first time, the lifetime language for surviving spouses was absent from Section 5.15, which became Section 5.30(b) at pages 71-72, and Section 6.2(c), which became Section 6.2(b) at page 81. (Ex. 1 to Docket No. 50, Aff. of James Richard Atwood). Under new Sections 5.31 and 5.32 at pages 72-76, there were new deductibles, co-insurance, out-of-pocket maximums and related changes. *(Id.)* The prescription drug co-payments were increased in

Section 5.11(c) at pages 41-42 to $5/$20/$35.[5]  (*Id.*)

     I.     *Caterpillar's Alleged 2005 Modifications to the Health Care Benefits and Communications with the Class*

On October 10, 2005, Caterpillar sent the class letters stating that:

> This letter is to update you on some of the benefit items that impact you as a result of the bargaining agreement signed by Caterpillar Inc. and the United Auto Workers (UAW) effective January 10, 2005.
> The agreement provides that survivors ... will pay healthcare premiums effective February 1, 2005. Since the agreement went into effect, we have taken the time to verify our records. We have delayed healthcare premiums to ensure that we charge correctly.
> ***
>
> If you choose to maintain your medical coverage, healthcare premiums will start effective January 1, 2006. You will not be required to pay premiums retroactively from February 1, 2005 through December 31, 2005. You will receive a premium invoice directly in the mail in January or, if applicable, the premium will be deducted from your February 1, 2006 pension check for January coverage. In early November, you will receive an enrollment kit with a Personal Fact Sheet from Fidelity acknowledging your new premium rates. Your new premium rates are as follows: [listing various monthly premium sharing co-payments of $87, $174, $170, $83 and $166].

(Ex. 3 to Docket No. 50).  The defendant sent Sandra Stewart letters announcing that in order to

keep her health care benefits, beginning in January 2006, she would have to pay $87 per month

(see Pls.' Exs. 2-3, 6/17/2006 Affidavit of Sandra Stewart with attachments, including

Caterpillar 10/10/2005 and 11/14/2005 letters to Stewart). For 6 months in 2006 (January until

---

[5]According to the plaintiffs and disputed by Caterpillar, under the 2004 IPA and GIP (effective January 10, 2005) the new $5/$20/$35 prescription drug co-payments were to take effect on January 1, 2006 only for retirement dates on or after January 10, 2005, and not before.  (Docket No. 50 at 8 n.6).  The plaintiffs contend that Caterpillar unlawfully applied the changes to class members whose deceased spouses retired prior to January 10, 2005.  (*Id.*)

June), Caterpillar deducted $87 per month from the survivor pension benefit for Sandra Stewart for this monthly premium sharing payment (sees Pls.' Ex. 2-3, earning statement dated February 1, 2006, showing a monthly deduction of $87).

In late 2005, Caterpillar sent out enrollment packets to class members, again listing monthly premium sharing co-payments for class members to pay in 2006 (see Pls.' Ex. 3, November 14, 2005 Caterpillar mailing to Stewart).

In February 2006, Caterpillar began deducting $87 per month for Sandra Stewart's coverage beginning in January (see Pls.' Exs. 2-3). Caterpillar deducted $87 each month for 6 months and later refunded those monies to her.

On March 29, 2006, Caterpillar sent a letter to Class members (see Pls.' Ex. 3) stating:

> You received a letter dated October 10, 2005 regarding healthcare premiums to begin on January 1, 2006. The letter indicated that you would begin paying the retiree premium for your healthcare coverage. There has been a delay in the collection of this premium. As a result, the premium will begin effective April 1, 2006 for healthcare coverage during that month. You will not be required to pay premiums retroactively. You will receive a premium invoice directly in the mail in April, which will be due May 1 or, if applicable, the premium will be deducted from your May 1, 2006 pension check for April coverage. Your new premium rates are as follows: [listing various coverages in 2006 for $87, $174, $170, $83 and $166 per month].

The plaintiffs filed this lawsuit on April 13, 2006. Within a few days, on April 17, 2006, Caterpillar sent class members a letter (see Pls.' Exs. 2-3) stating:

> You were previously informed that Caterpillar would begin collecting retiree premiums for healthcare coverage (in letters
>
> dated October 10, 2005 and March 29, 2006). To date, you have not been charged while Caterpillar evaluated other options regarding your healthcare premiums. As a result of this review,

17

> Caterpillar has elected to waive your healthcare premiums. You
> will not be charged a premium for healthcare coverage.

*(Id.,* ¶ 34; Ex. 24.)   All affected surviving spouses were so advised and, to date, they have not

been charged any premiums.  *(Id.,* ¶ 34).

J.    *The Named Plaintiffs*

Plaintiff Kerns is the surviving spouse of former Caterpillar employee Jerome Kerns.  *(Id.*

¶ 33).  Mr. Kerns retired from Caterpillar in September 1998 and died in June 2002.  *(Id.)*

Plaintiff Nalley is the surviving spouse of former Caterpillar employee Bernard Nalley.  *(Id.)*

Mr. Nalley retired from Caterpillar in September 1998 and died in May 2003.  *(Id.)*  Plaintiff

Stewart is the surviving spouse of former Caterpillar employee Elmer Stewart.  *(Id.)*  Mr. Stewart

never retired from Caterpillar; rather, he died in June 2004 while on long-term disability leave.

*(Id.)*

III.    Standard of Review

The defendant has brought this motion pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). When a defendant attacks subject matter jurisdiction under Rule 12(b)(1),

the plaintiff must meet the burden of proving jurisdiction. *Golden v. Gorno Bros., Inc.,* 410 F.3d

879, 881 (6th Cir. 2005). In addition, the district court is empowered to resolve factual disputes

when necessary to resolve challenges to subject matter jurisdiction. *United States v. Ritchie,* 15

F.3d 592, 598 (6th Cir. 1994), *cert. denied,* 513 U.S. 868, 115 S. Ct. 188, 130 L.Ed.2d 121

(1994).  In so doing, the court may consider evidence outside the pleadings, and the record may

be supplemented by affidavits.  *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003);

*Rudd v. Baker Furniture*, 967 F. Supp. 984, 989 (M.D. Tenn. 1997).  The court can do so without

18

converting the Rule 12(b)(1) motion into a motion for summary judgment.  *Rudd*, 967 F. Supp. at 989 (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

IV.    Analysis

A.    *The court has jurisdiction over the plaintiffs' Section 301 LMRA claims*.

Caterpillar contends that the court lacks jurisdiction to decide the plaintiffs' Section 301 LMRA claims for benefits that allegedly arose under an expired or superseded labor contract. According to the defendant, the plaintiffs ground their claims in the 1998 IPA and appended GIP, and because that contract expired in April 2004 and was superseded by subsequent labor contracts, the court lacks jurisdiction over the plaintiffs' LMRA claims.  In support of its position, Caterpillar cites *Bauer v. RBX Indus., Inc*., 368 F.3d 569, 579 n.5 (6th Cir. 2004)("a federal court does not have jurisdiction to hear a § 301 claim premised upon an expired or superseded contract"); *Heussner v. Nat'l Gypsum Co.*, 887 F.2d 672, 676 (6th Cir. 1989)(same); and *Adcox v. Teledyne, Inc.*, 21 F.3d 1381 (6th Cir. 1994)(same).

However, the facts of the cases relied on by the defendant to support its contention that the court lacks subject matter jurisdiction are distinguishable.  In *Heussner*, the plaintiffs sought to collect benefits accruing after the expiration of a CBA, on the theory that the successor agreement was entered into invalidly.  887 F.2d at 677.  The Sixth Circuit determined that the district court lacked jurisdiction under § 301(a) over questions of the validity of collective bargaining contracts.  *Id.*  In *Bauer*, which involved a hybrid § 301 claim (unlike the instant case), the union reached a settlement that abrogated the previous CBA and extinguished benefits that had been provided by the prior CBA.  368 F.3d at 579. The Sixth Circuit held that: "The only contract in existence . . . was the Settlement.  The Plaintiffs do not allege that RBX

19

breached the Settlement, and to the extent they argue the Settlement was invalid, '[d]istrict courts do not . . . possess subject matter jurisdiction under Section 301(a) in cases concerning the validity of a contract.'" *Id.* at 578-79. The court specifically rejected the plaintiffs' claim that the benefits sought had vested and thus could not have been affected by the settlement, "given that the terms of the Plans either specifically disclaim[ed] vesting or [were] silent on the issue." *Id.* at 584. *Adcox* involved a hybrid § 301 claim of "special distribution" benefits that did not vest before they were abolished by a successor contract, which the plaintiffs challenged as invalid. 21 F.3d 1381. The Sixth Circuit found that the district court had properly determined that it lacked jurisdiction to entertain a challenge under § 301 to validity of a CBA that had been superseded by a settlement agreement. *Id.* at 1388-89.

In this case, the plaintiffs seek to collect benefits that they claim accrued or vested *before* the CBA's expiration in April 2004. Thus, unlike the plaintiffs in *Heussner*, *Bauer*, and *Adcox*, the instant plaintiffs do not challenge the validity of any CBA or related agreement. Neither do the plaintiffs seek to modify any CBA or related agreement. Instead, these plaintiffs contend that the benefits they seek vested before ratification of a new contract, and thus survived. *See Int'l Union UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983)("In settling a claim for vested benefits, the retiree does not modify the collective bargaining agreement."). *Heussner*, *Bauer*, and *Adcox,* then, are not controlling.

Section 301(a) of the LMRA provides federal jurisdiction over claims alleging breach of a CBA. 29 U.S.C. § 185(a); *see Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991); *Adcox*, 21 F.3d at 1385; *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 656-57, 118 S. Ct. 1626, 1678-79 (1998). Although a retiree health care

20

benefit plan constitutes a welfare benefit plan under ERISA, 29 U.S.C. § 1001 *et seq.*, unlike pension benefit plans, retiree health care benefit plans are not subject to mandatory vesting requirements. *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000). If lifetime health care benefits exist for the plaintiffs, it is because the UAW and Caterpillar agreed to vest a welfare benefit plan. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654 (6th Cir. 1996); *see also Boyer v. Douglas Components Co.,* 986 F.2d 999, 1005 (6th Cir. 1993).

If a welfare benefit has not vested, "'after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA.'" *Bittinger v. Tecumseh Prods. Co.,* 83 F. Supp.2d 851, 857 (E.D. Mich.1998) (quoting *Am. Fed'n of Grain Millers v. Int'l Multifoods,* 116 F.3d 976, 979 (2d Cir. 1997)). If a welfare benefit has vested, the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation. *Maurer,* 212 F.3d at 914; *Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 578 (6th Cir. 2006).

"If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees." *Maurer*, 212 F.3d 907, 918. "If the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a LMRA violation.*" Maurer*, 212 F.3d at 914 (citation omitted). Whether the parties to a CBA provided for health insurance benefits for retirees that would vest upon eligibility for retirement is a question of the intent of the parties. *See Yard-Man*, 716 F.2d at 1476. Therefore, the plaintiffs' claims require us to interpret the CBA, and the suit is properly before the court under Section 301 of the LMRA, 29 U.S.C. § 185.

> B. *The court has jurisdiction over the plaintiffs' ERISA claims*.

The court's ruling as to jurisdiction over the plaintiffs' Section 301 LMRA claims does not automatically determine its ruling as to jurisdiction over the plaintiffs' ERISA claims because "the court's power to entertain the ERISA claims springs from a different statutory provision, as the court has jurisdiction over a § 1132(a)(1)(B) action pursuant to 29 U.S.C. § 1132(e)(1)." *Bauer*, 368 F.3d 569, 582 (finding that the court lacked jurisdiction over the plaintiffs' ERISA claims, and specifically rejecting the plaintiffs' claims that their welfare benefits had vested because the terms of the plans either specifically disclaimed vesting or were silent on the issue).

Precedents such as *Adcox*, *Heussner*, and *Bauer* dictate that federal courts have no power to hear an ERISA claim regarding a welfare benefit plan that has been superseded. *Bauer*, 368 F.3d at 584. However, the plaintiffs here assert that their rights to lifetime health benefits had vested contractually before termination of the CBA, and, therefore, the Union could not bargain them away and Caterpillar cannot now refuse to pay them. The same argument was made by the plaintiffs in *Adcox*. *See* 21 F.3d 1381, 1388-89. There, the court found that, because the benefits did not by the terms of the governing contract vest, and the CBA had been superseded by a subsequent contract, the district court lacked jurisdiction under § 1132 to entertain a challenge to the first agreement's validity. *See id.* In the instant case, the plaintiffs contend that the pertinent language evidences an intent for their benefits to vest. The court has found that plaintiffs are not challenging the validity of any contract. Thus, as the court has jurisdiction over the instant plaintiffs' Section 301 LMRA claims, so does the court over the plaintiffs' ERISA claims under Sections 502(e) and (f) of ERISA, 29 U.S.C. § 1331.

C. *At this stage of the litigation, it would be premature for the court to rule on the merits as to whether the plaintiffs have a vested right in the lifetime health benefits they seek.*

The CBA's are contracts and, as a result, the court applies general principles of contract law to determine whether the retiree benefits sought in this case are vested. *Yard-Man*, 716 F.2d at 1479-80. *Yard-Man* recognized that parties to CBA's can agree to vest benefits that survive the termination of the agreement. *Id.* at 1479. Whether the benefits vest depends upon the intent of the parties. *Golden,* 73 F.3d at 654. "Courts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement." *Maurer,* 212 F.3d at 915. In *Golden,* the Sixth Circuit clarified that, in determining the intent of the parties to a CBA, "basic rules of contract interpretation apply." *Golden,* 73 F.3d at 654.

Courts "should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Yard-Man,* 716 F.2d at 1479. Moreover, courts "should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." *Id.* As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. *Id.* at 1479-80. When ambiguities exist, courts may look to other words and phrases of the document and other extrinsic evidence. *Id.* at 1480; *see also Golden,* 73 F.3d at 654; *UAW v. BVR Liquidating*, 190 F.3d 768, 774 (6th Cir. 1999)(extrinsic evidence is admissible to determine an intent to vest benefits when the language of the collective bargaining agreement is ambiguous). The court should review the interpretation ultimately derived from its examination of the language, context, and other indicia of intent for consistency with federal labor policy. *Yard-Man*, 716

23

F.2d at 1479-80. With these principles in mind, the court considers whether the instant plaintiffs have a vested right to the lifetime medical benefits they seek.

a. *Durational language of the CBA, IPA, and GIP*

The governing CBA contains no provisions related to health benefits. Retiree health benefits are addressed in two other documents, the IPA and the GIP. The IPA, like the CBA, was effective by its terms until April 1, 2004. The IPA expressly states: "Termination of this Agreement shall not have the effect of automatically terminating the Plan." "The Plan" refers to the GIP. This language indicates that, even though the Agreement (the CBA) expires by its terms on April 1, 2004, the GIP and the concomitant benefits provided thereby need not also expire.

Section 5.1 on page 38 of the GIP, under Section V entitled "Medical Expense Benefits," provides:

> A benefit shall be provided in accordance with this Section only for an Employee, while coverage for such benefit is in effect with respect to such Employee. **Benefits in accordance with this Section will be provided to such Employee, retired Employee, and Dependents thereof for the duration of any Agreement to which this Plan is a part**.

(Ex. 7 to Docket No. 50)(emphasis added). Caterpillar reads this language to say that health benefits (including retiree health benefits) lasted *only* as long as the labor contracts themselves. (Docket No. 56 at 5-6). This type of specific durational language, urges Caterpillar, is fundamentally inconsistent with the plaintiffs' claim of vesting. (*Id.* at 6). Conversely, the plaintiffs read this language to require that Caterpillar provide benefits to employees, retirees,

and dependents *at least* for the duration of the labor contracts. Thus, say plaintiffs, this language does not defeat their claim of vesting; if anything, it renders the language of the governing document ambiguous and opens up the court's inquiry to extrinsic evidence.

As in *Smith v. ABS Indus., Inc.*, 890 F.2d 841 (6th Cir. 1989), the court finds that both the plaintiffs and Caterpillar "have presented plausible interpretations of the contractual language of the retiree benefits plan." *Id.* at 846. Thus, extrinsic evidence may be properly introduced to resolve the ambiguity. *Id.*; *see also Park-Ohio Industries*, 876 F.2d 894 ("both parties have offered plausible interpretations of the agreement drawn from the contractual language itself [which] demonstrates that the provision is ambiguous. Neither of the two proffered interpretations is frivolous nor unreasonable on its face, and inquiry should be permitted into extrinsic circumstances."). Moreover, Caterpillar's reading of Section 5.1 of the 1998 GIP seemingly contradicts the IPA's express statement that termination of the CBA "shall not have the effect of automatically terminating" the GIP. *Yard-Man* admonishes the court, whenever possible, to construe each provision of the contract consistently with one another and with the entire document.

        b.     *Language tying retiree health benefits to pension eligibility*

The relevant language of the 1998 GIP is as follows:

> 5.15 Retiree Medical Insurance. Retired Employees who satisfy the requirements hereinafter set forth shall be entitled to the same benefits provided in this Section V as if they were Employees, subject to the provisions of paragraph 6.1(iv).
>
>              \*\*\*
>
> For Employees retiring on and after May 1, 1992, such benefits to the extent provided in this paragraph 5.15 will be provided after his retirement from active service if he has accrued at least 10

25

years of credited service (5 years if hired after age 60) under the Non-Contributory Pension Plan after the earlier of age 45 or the date he has accrued 20 years of credited service under the Non-Contributory Pension Plan and at his retirement is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan or would be eligible for such immediate commencement but for his election to defer commencement of his pension.

Coverage shall take effect on his retirement date.

\*\*\*

Dependents' Coverage shall be in effect in accordance with this paragraph 5.15 while Personal Coverage is in effect with respect to all Dependents of a retired Employee who were covered hereunder on the day preceding his retirement, and such Dependents' Coverage will be continued following the death of a retired Employee for the remainder of his surviving spouse's life without cost.

(Ex. 7 to Docket No. 50). Section 6.2(c) on page 104 reiterates as to surviving spouses:

[S]uch Dependents' Coverage for any such surviving spouse . . . will continue in effect . . . for the remainder of her life without cost.

(*Id.*) Significantly, this language links retiree and surviving spouses medical benefits to pension eligibility. The Sixth Circuit has held that this constitutes strong evidence of vesting. For example, in *Yolton*, a 2006 case, the Sixth Circuit affirmed the district court's finding that the plaintiffs' benefits had vested, explaining that

. . . the district court interpreted the language of the agreement and found evidence that the defendants intended to confer lifetime benefits upon the plaintiffs. Of particular significance to the district court was language in the Group Insurance Plan that tied benefits to the pension plans . . . . Because the pension plan is a lifetime plan and the health insurance benefits are tied to the

pension plan, the district court found that the health insurance

26

benefits were vested and intended to be lifetime benefits.

435 F.3d at 580. In *Golden*, similar language in each of the CBA's tied retiree benefits and surviving spouse eligibility for health insurance coverage to eligibility for vested pension benefits. 73 F.3d at 656. The Sixth Circuit affirmed the district court's finding that, "[s]ince retirees are eligible to receive pension benefits for life . . . the parties intended that the company provide lifetime health benefits as well." *Id.* Similarly, in *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417 (6th Cir. 2004), the Sixth Circuit affirmed the district court's finding that the retiree plaintiffs had established a likelihood of success on the merits of their claim. *Id.* at 426. After finding that the collective bargaining agreement in that case incorporated a supplemental agreement, the Court held, "Because the Supplemental Agreement ties eligibility for retirement-health benefits to eligibility for a pension, in other words, there is little room for debate that the retirees' health benefits vested upon retirement under *Golden* . . . ." *Id.* at 422*; see Cole v. ArvinMeritor, Inc.*, 2006 WL 2620305, *7 (E.D. Mich. 2006)(because, *inter alia*, the governing contract ties retiree health benefits to pension status, it "constitutes an enforceable contractual promise of lifetime retiree health benefits to accompany lifetime pension benefits.").

Likewise, in this case, the language of paragraph 5.15 of the 1998 GIP unambiguously ties retiree health benefits to pension eligibility. Under the controlling law, such language constitutes strong evidence of an intent to vest.

      c.    *The Yard-Man inference*

"Retirement benefits are typically understood as a form of delayed compensation for present services, for which workers forego present wages." *Terrell v. Dura Mech. Components,*

*Inc.*, 934 F. Supp. 874, 881 (N.D. Ohio 1996)(citing *Allied Chem. Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 180)).  As one court remarked: "It is unlikely that workers would leave a significant portion of their remuneration to the contingencies of future bargaining agreements, especially since they are presumably aware that the union is not obliged to bargain for continued benefits for retirees."  *Id.* (*citing Yard-Man*, 716 F.2d at 1482).

Indeed, the Sixth Circuit in *Yard-Man* explained that retiree benefits are, in a sense, "status" benefits that carry an inference that they continue as long as the requisite status is maintained.  *Yard-Man*, 716 F.2d at 1483.  "This contextual factor," according to the Sixth Circuit, can buttress "the already sufficient evidence of such intent in the language of the agreement itself."  *Golden*, 954 F. Supp. at 1184 (citing *Yard-Man*, 716 F.2d at 1482).

Although the *Yard-Man* decision has generated controversy and its viability has been challenged, *Yard-Man* remains good law.  *See Yolton*, 435 F.3d at 579-80 ("There is no need to revise, reconsider, or overrule *Yard-Man*."); *Golden*, 73 F.3d at 656 ("After considering the arguments the defendant makes, and the cases it cites, we conclude that *Yard-Man* is still good law, and controls this case.")

        d.    *Extrinsic evidence*

Next, having determined that the language of the governing contracts is ambiguous, it is appropriate for the court to consider extrinsic evidence, if any, of Caterpillar's alleged intent to confer lifetime health benefits to surviving spouses.   However, at this early stage of the proceedings,  there has not been significant discovery on this matter.  (Docket No. 50 at 19).  The plaintiffs represented to the court by brief filed on November 30, 2006, that "[d]uring discovery and review of benefit files, Plaintiffs expect to locate additional evidence confirming

that these are vested lifetime benefits." (*Id.* at n.10).

In their memorandum filed on April 26, 2007 in reply to Caterpillar's response to the plaintiffs' motion for class certification, the plaintiffs reference Caterpillar's medical expense survivor's coverage hourly forms for Plaintiffs Kerns and Nalley, which indicate, according to the plaintiffs, that at the time their spouses died, Caterpillar intended that they, as surviving spouses, would have "lifetime" coverage "at no cost." (Docket No. 67 at 5, Exs. 10 & 11). The plaintiffs represent that they "expect to locate similar forms for other class members once Defendant produces the additional files." (*Id.*) The plaintiffs further argue that, "at this stage of the case, without significant discovery, it would be premature" for the court to make a substantive determination as to whether Caterpillar intended to provide vested lifetime benefits to the surviving spouses. (*Id.* at 15).

The discovery cutoff deadline for this case, as established by the Joint Initial Case Management Order entered on December 29, 2006, is November 30, 2007. (Docket No. 98 at 4). Dispositive motions, in which the parties could better argue their positions with regard to vesting and present evidence gleaned through discovery in support of their positions, are not due until May 16, 2008. (*Id.*) The court finds that it is too soon in this case to issue a ruling as a matter of law as to whether the plaintiffs' benefits are vested and when, if ever, they vested. It is clear that the plaintiffs' claims should not be dismissed at this stage, notwithstanding Caterpillar's urging, considering the language of the GIP tying retiree health benefits to pension eligibility, which the Sixth Circuit has found constitutes significant evidence of an intent to vest benefits.

D.     *The proposed class is limited to surviving spouses.*

Caterpillar seeks dismissal of the plaintiffs' claims on behalf of "future" surviving

29

spouses, alleging that these claims fail because such a group does not exist at this time.   Nor,

urges Caterpillar, is there any reasonable level of certainty as to who may fall within that group.

(Docket No. 43 at 16).  Caterpillar points out that no named Plaintiff falls within this purported

group.  (*Id.*)

In response to Caterpillar's motion to dismiss, the plaintiffs contend that it is common for

individuals to "grow into" the class definition after the suit is filed.  (Docket No. 50 at 4).   Later,

in their reply to Caterpillar's response to the plaintiff's motion for class certification, the

plaintiffs clarify that the proposed class does not include persons who are not, at this time,

surviving spouses.  (Docket No. 67 at 2).  Stated differently, the plaintiffs explain that "[a]ny

person who is presently the spouse of a living retiree cannot presently be a class member."  (*Id.*)

This clarification resolves the concerns raised by Caterpillar in its motion to dismiss regarding

the claims of a hypothetical group of future surviving spouses.  A person who is presently the

spouse of a living retiree might become a class member in the future, if and when he or she

should meet the class definition and become a surviving spouse.  The proposed class, however,

only includes surviving spouses--not spouses of living former employees.

> E.     *The named plaintiffs' claims are not moot.*

Caterpillar contends that the plaintiffs' surviving spouse claims must be dismissed

because the plaintiffs did not suffer any Article III injury-in-fact and their claims are moot.

According to Caterpillar, although the company notified surviving spouses of 1998-2004 retirees

who died while the 1998 labor contracts were in effect of their obligation to contribute premium

payments, Caterpillar later notified those surviving spouses by letter that it was waiving their

premiums and, to date, none have been charged any premiums.  Caterpillar also contends that the

named plaintiffs have not suffered any injury in fact because Caterpillar only threatened to modify benefits and never actually modified benefits.

On the other hand, the plaintiffs allege that, as to the monthly premium sharing co-payments, Caterpillar charged Plaintiff Stewart $87 per month from January until June 2006. Even though Caterpillar later refunded the money and stated (after this lawsuit was filed) that it had "elected to waive" the class member's healthcare premiums, the plaintiffs contend that Caterpillar could impose monthly health care premium sharing co-payments on the class at any time, should it change its mind. The plaintiffs also allege that, effective January 2006, Caterpillar changed the health care benefits by requiring higher prescription drug co-payments, new deductibles, new out-of-pocket maximums, and related charges, and that Caterpillar threatens to make further increases in 2008 and 2010. The plaintiffs seek the restoration of the benefits they enjoyed prior to the January 1, 2006 changes.

"Under Article III of the Constitution, [a federal court's] jurisdiction extends only to actual cases and controversies. [A federal court] has no power to adjudicate disputes which are moot." *McPherson v. Mich. High. Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 458 (6th Cir. 1997) (internal quotation omitted). In general, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000) (internal quotation omitted). A defendant's voluntary conduct may moot a case only if "subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *id.,* and if "interim relief or events have completely and irrevocably eradicated the effects

31

of the alleged violation." *Ammex, Inc. v. Cox,* 351 F.3d 697, 705 (6th Cir. 2003) (citing *County of Los Angeles v. Davis,* 440 U.S. 625, 631(1979)). The "heavy burden" of demonstrating that the challenged conduct will not resume rests on the party claiming mootness. *Friends of the Earth,* 528 U.S. at 189; *Ammex, Inc.,* 351 F.3d at 705.

On this record, viewed in the light most favorable to the plaintiffs, the court cannot find that Caterpillar has met this burden. Although Caterpillar represented to the plaintiffs in its April 17, 2006 letter that it "will not" impose premiums on the plaintiffs, Caterpillar consistently has maintained the position in this lawsuit that the plaintiffs' benefits are not vested and that Caterpillar has a legal right to modify or terminate benefits at any time. Thus, Caterpillar's voluntary decision to waive the premiums *for now* in light of its position that the benefits are not vested and are subject to change does not "make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

Moreover, Section 502(a)(1)(B) of ERISA specifically allows plan participants to bring an action for a declaratory judgment to clarify their rights to future benefits under an ERISA plan.

> If a plan participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring a suit seeking provision of those benefits. A participant or beneficiary can also bring suit generically to "enforce his rights" under the plan, or to clarify any of his rights to future benefits. Any dispute over the precise terms of the plan is resolved by a court under the de novo review standard.

*Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004). Here, the plaintiffs are participants in a negotiated ERISA benefit plan. They brought this lawsuit in part to clarify their rights to future benefits under the plan and to challenge the benefit modifications Caterpillar already has made,

32

such as higher prescription drug co-payments, new deductibles, new out-of-pocket maximums, and related charges. The plaintiffs are entitled to have those issues resolved now, and they should not have to wait until Caterpillar changes its mind and later elects to require them to pay healthcare premiums or implements the additional changes to their benefits. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 51, 53 (1987)("Under the civil enforcement provisions of § 502(a), a plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits. Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits.").

The court finds that Caterpillar's actions have raised a definite and concrete controversy regarding the plaintiffs' rights to benefits under the plan and, therefore, the plaintiffs may bring this action to clarify their rights to future benefits under the plan. The plaintiffs' claims are not moot.

          V.    <u>Conclusion</u>

For the reasons explained herein, the defendant's motion to dismiss (Docket No. 42) will be denied.

An appropriate order will enter.

                                    ALETA A. TRAUGER
                                    United States District Judge