# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

GARY T. WINNETT, et al.,                )
                                        )
  Plaintiffs,                 )
                                        )
v.                                      )  Case No. 3:06-0235
                                        )  Judge Trauger
CATERPILLAR INC.,                       )
                                        )
  Defendant/Third-Party Plaintiff,   )
                                        )
v.                                      )
                                        )
INTERNATIONAL UNION, UAW, et al.        )
                                        )
  Third-Party Defendants.      )
                                        )

---

JUDITH K. KERNS, et al.,                )
                                        )
  Plaintiffs,                 )
                                        )
v.                                      )  Case No. 3:06-1113
                                        )  Judge Trauger
CATERPILLAR INC.,                       )
                                        )
  Defendant/Third-Party Plaintiff,   )
                                        )
v.                                      )
                                        )
INTERNATIONAL UNION, UAW, et al.        )
                                        )
  Third-Party Defendants.      )
                                        )

1

## MEMORANDUM

These are two related, but not consolidated, cases. As can be seen herein, the overlap in the relevant facts dictates that it is in the interest of judicial economy to address the pending motions in these two cases in one opinion. In each case, pending before the court are Motions for Summary Judgment filed by the remaining third-party defendant, the International Union, UAW ("UAW"), the plaintiffs, and the defendant Caterpillar. (*Winnett* Docket Nos. 398, 404 and 410, respectively; *Kerns* Docket Nos. 207, 213, and 214, respectively.)[1] In both cases, the UAW's motion will be granted, and Caterpillar's Third-Party Complaint against the UAW will be dismissed. Also, in both cases, the plaintiffs' and Caterpillar's motions will be granted in part and denied in part.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

As has been discussed in several previous opinions, the plaintiffs in these cases seek health insurance benefits from defendant Caterpillar, and these cases center around the meaning of certain language in various labor agreements entered into by the UAW and Caterpillar.[2] The

---

[1] As discussed below, an additional motion to re-open discovery in both proceedings was filed by Caterpillar and that motion will be denied.

[2] Unless otherwise noted, the facts are drawn from the parties' statements of material facts, (*Winnett* Docket Nos. 431, 435, 436, 448, 453, and 454; *Kerns* Docket Nos. 241, 243, 244, 251, and 256) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). As indicated above, the court has issued several previous opinions in these cases that provide additional factual background, including more lengthy quotations of some of the relevant contractual provisions. *See e.g. Winnett v. Caterpillar*, 496 F. Supp. 2d 904, 908-14 (M.D. Tenn. 2007); *Kerns v. Caterpillar*, 499 F. Supp.2d 1005, 1009-1017 (M.D. Tenn. 2007). While some repetition from the previous opinions is unavoidable, some basic familiarity with the dispute will

Case 3:06-cv-01113   Document 262   Filed 03/26/10   Page 2 of 48 PageID #: 9089

*Winnett* case is pursued by individuals who either worked for Caterpillar or who had a spouse who did (Gary Winnett, Freda Jackson-Chittum, Casper Harris, William Dailey, Calvin Grogan, Kenneth Hammer, Charles Waterfield, and Michael Finn), and they pursue this litigation on behalf of themselves and their class. The *Kerns* litigation is pursued by three named plaintiffs, each of whom is the "surviving spouse" of an individual who worked at Caterpillar (Judith Kerns, Marcia Nalley, and Sandra Stewart), and they pursue this litigation on behalf of themselves and their class.

### A. Basic Historical Background

The Caterpillar-UAW bargaining relationship began in the late 1940s and, over time, the relationship expanded to include employees at various Caterpillar facilities, primarily in Illinois. For the relevant time period, the UAW was the exclusive bargaining representative for these employees, and, under federal law, Caterpillar was obligated to negotiate with the UAW before making any changes to the terms and conditions of employment.

During the course of their bargaining relationship, Caterpillar and the UAW agreed to engage in multi-plant bargaining for most represented employees. This practice, known as "Central Bargaining," resulted in a labor contract, which included a Central Labor Agreement ("CLA") along with various related local agreements and benefits agreements. Beginning in

be assumed, and, therefore, not every fact provided in the parties' voluminous (and frequently highly repetitive) statements of material facts is discussed herein. Additionally, on January 27, 2009, the Sixth Circuit issued an opinion reversing this court on certain conclusions that the court reached in denying Caterpillar's Motion to Dismiss in *Winnett*. *See Winnett v. Caterpillar*, 553 F.3d 1000. As discussed herein, this opinion and the court's previous opinions substantially affect (and limit) the analysis and ultimate conclusions, and the court has tailored the factual discussion consistent with that analysis.

3

1952, Caterpillar retirees began to be eligible for limited medical coverage at defined monthly contribution levels. By the time of the 1988 Agreement, provisions for health insurance benefits, including retiree health care, were set forth in an Insurance Plan Agreement ("IPA") between Caterpillar and the UAW, along with a Group Insurance Plan ("GIP") and a Summary Plan Description ("SPD"), which was designed to clearly summarize the important provisions of the benefits agreement.

### B. The 1988 Labor Agreement

As discussed in detail in previous opinions, Section 5 of the 1988 GIP set forth provisions regarding active employee and retiree health care. Section 5.1 provided that Caterpillar would provide coverage to employees "without cost." Section 5.15 provided that Caterpillar would also provide coverage for otherwise eligible retirees "without cost to any such retired Employee." The 1988 GIP also provided that, following the death of a retired employee, coverage for the surviving spouse "will be continued . . . for the remainder of [the] surviving spouse's life without cost." (*Kerns* Docket No. 243 at 7.) The 1988 IPA also stated that "Termination of this Agreement shall not have the effect of automatically terminating the Plan," referring to the GIP. (*Winnett* Docket No. 436 at 19.)

The 1988 SPD summarized the benefits of the 1988 labor agreement. As to retirees, the 1988 SPD stated that, "[i]f you retire and are eligible for the immediate receipt of a pension (with at least 5 years of credited service) under the Non-Contributory Pension Plan, you will be eligible for the Retired Medical Benefit Plan, continued at no cost to you." (*Winnett* Docket No. 431 at 14.) The 1988 SPD went on to say that, "[i]f an active employee dies when eligible to

4

retire or if a retired employee dies, the surviving spouse will have coverage for his or her lifetime at no cost to the survivor." (*Id.*) The 1988 SPD also contained a provision that allowed Caterpillar, "subject to the applicable collective bargaining agreements," to terminate the employee benefit plans. (*Id.*)

### C. Negotiations and the Termination of the 1988 CLA

With the 1988 CLA set to expire later in the year, in July 1991, both Caterpillar and the UAW gave notice that they intended to terminate the 1988 CLA and negotiate modifications to the various labor agreements. In the Fall of 1991, Caterpillar and the UAW commenced negotiations concerning a successor labor agreement, with a labor dispute quickly developing as to acceptable terms. One area of particular dispute centered around changes to medical benefits for existing and future retirees that was proposed by Caterpillar. After a series of extensions, the UAW terminated the 1988 labor contract on November 3, 1991 and commenced a selective strike at certain Caterpillar facilities.

On March 5, 1992, Caterpillar advised the UAW that it believed that the parties' negotiations were at a legal impasse. Thereafter, by letters dated March 31, 1992, Caterpillar announced (via notice to the UAW and Caterpillar's employees) that it would unilaterally implement portions of its final contract offer, including a health care coverage NetWork (which could result in certain out-of-pocket costs for plan participants who elected not to use NetWork physicians) and certain changes to retiree benefit coverage that would result in increased medical costs for the retiree. These changes were implemented on April 6, 1992, and, that summer, Caterpillar sent letters to the UAW and to all affected employees, retirees, dependents and

5

surviving spouses, notifying them of the institution of the NetWork effective July 1, 1992..

As continued negotiations failed to produce an agreement, on November 20, 1992, Caterpillar advised the UAW that, effective December 1, 1992, it would implement additional provisions from its final offer, including caps on the amount that Caterpillar would pay for future retiree health coverage. That is, *beginning in the year 2000*, individuals who retired on or after January 1, 1992 would be responsible for an undetermined amount of "above the cap" health care costs.[3] The December 1992 unilateral implementation, however, continued to provide that coverage for surviving spouses would be "continued following the death of a retired Employee . . . without cost" for the "remainder of [the] surviving spouse's life." (*Kerns* Docket No. 243 at 10.) The approximately 744 individuals who retired between January 1, 1992 and December 1, 1992, were, according to Caterpillar, subject to the unilaterally implemented terms.

It is not disputed that employees who retired prior to January 1, 1992 are not subject to the retiree medical cost caps Caterpillar implemented in December 1992, although even pre-1992 retirees and their surviving spouses have always incurred some costs in the form of co-pays and/or limits on coverages. Indeed, despite the fact that the 1988 GIP states that retiree health benefits are provided at "no cost," the testimony from the preliminary injunction hearing in *Winnett* indicated that retirees who retired under a "no cost" scheme have always been responsible for the costs of office visits (including visits to specialists) and prescription drug co-

---

[3] For instance, a November 19, 1992 letter from Caterpillar to its employees estimated that, in the year 2000, "the premium, if any, will be relatively small – in the range of $20 to $30 a month," and the communication speculated that, by the year 2000, "the United States might have a national health care program which could eliminate the need for premiums." (Docket No. 435 at 6.)

payments.  (*Winnett* Docket No. 298 at 256, 274, 365; Docket No. 299 at 549.)

### D. Caterpillar Logistics Services - An Aside in the Timeline

Caterpillar Logistics Services, Inc. (CLS) was formed in 1987 as a Caterpillar subsidiary, the purpose of which was to market Caterpillar's global warehousing and product distribution expertise to third-party customers.  As further discussed below, the *Winnett* class contains a CLS subclass, which consists of all hourly CLS employees (and their spouses) who were represented by the UAW during their employment and who retired between January 1, 1992 and March 16, 1998.  In May 1988, Caterpillar and the UAW entered into the "CLS Agreement," which guaranteed that certain services provided to third parties would not be interrupted in the event of a strike, and, in the event of a strike, the 1988 CLA (including its benefits provisions) would remain in "full force and effect" for CLS employees past its expiration date and until the ratification of a successor agreement for CLS employees.  (*Winnett* Docket No. 436 at 26-28.)

Additionally, Section 5(a) of the CLS Agreement provides that, upon ratification of a new CLA, "all terms" of that new CLA, would be "automatically applicable" to "Covered [CLS] Employees."  (*Id*.)  The CLS Agreement defines "Covered Employees" as "any employees within units covered by the Central Labor Agreement and who are engaged in work involving or related to Caterpillar parts distribution or CLS work."  (*Id*.)  The parties agree that the 1988 CLA continued to be in effect for CLS employees during the labor dispute from November 4, 1991 through March 16, 1998, and CLS employees, during this period, did not strike and worked under the 1988 CLA, with their pay, working conditions and benefits all being dictated by the terms of the 1988 CLA.  It is also undisputed that all members of the CLS subclass retired prior

7

to ratification of the successor labor agreement in 1998, and, until that ratification, received retirement benefits under the 1988 CLA.

### E. The March 1998 Agreement

Negotiations continued between the UAW and Caterpillar until March 16, 1998, when a successor agreement was finally ratified. The 1998 GIP continued to include the same language in Section 5.15 that stated that surviving spouses' coverage "will be continued followed the death of a retired Employee for the remainder of [the] surviving spouse's life without cost."[4]

The 1998 IPA and GIP contained amended provisions concerning health benefits, including provisions that Caterpillar had unilaterally implemented in 1992, such as the NetWork and the caps. Specifically, the 1998 GIP states that, effective for employees retiring on or after January 1, 1992, Caterpillar's "maximum average annual cost per covered individual for retiree medical benefits . . . commencing January 1, 1999 shall be limited to the average annual cost per covered individual in 1997 projected to 1999." (*Kerns* Docket No. 241 at 40.) In April and June 1998, after substantial internal discussion, Caterpillar began to apply the NetWork provisions and retiree medical caps (along with several additional cost obligations for vision and dental coverage) to the CLS subclass and sent announcements regarding this to "all affected populations." (*Winnett* Docket No. 436 at 39.)

However, the actual financial impact of all of this was tempered by the VEBA agreement. Under this Agreement, Caterpillar and the UAW agreed to contribute approximately

---

[4]As discussed previously, Section 6.2(c) of the 1988, 1992, and 1998 labor agreements/implementations contained a similar provision. (*See Kerns* Docket No. 243 at 8-13.)

$35 million in funds previously accrued for active employees under the 1988 CLA to a Voluntary Employee Benefits Association (VEBA). The VEBA, which was operated by an independent trustee, paid expenses incurred by post-January 1, 1992 retirees and their dependents over and above the monetary caps implemented by Caterpillar. During the course of the 1998 CLA, most estimates were that VEBA money would be sufficient to pay medical "above the cap" costs through the end of the 1998 CLA in 2004.

After the 1998 labor agreement was reached, Caterpillar prepared "Summary of Benefit Changes" announcements, which advised that, consistent with earlier representations, contributions from Caterpillar would be limited as of 2000 for employees who retired after January 1, 1992. But, the summary stated, "VEBA assets will be used to cover the difference in monthly premiums after the year 2000 until trust assets are depleted. Retirees may be required to pay a monthly premium for coverage after the trust is depleted." (*Winnett* Docket No. 431 at 48.)

In 1999, Caterpillar issued a new SPD to all employees and retirees, which summarized the 1998 CLA. Referring to the VEBA and post-January 1, 1992 retirees, the 1999 SPD stated that, "once that fund is depleted, monthly premium contributions from retirees will be required." (*Id.* at 51.) Consistent with previous labor agreements, the 1999 SPD also stated that, "if you die while eligible to retire or following your retirement, your surviving spouse will have coverage for his or her lifetime without cost." (*Id.*) The 1999 SPD also reserved Caterpillar's right to "discontinue or change the plans in the future." (*Id.*)

        **i.**       **The LDSA**

After the 1998 labor contract was signed, the UAW and Caterpillar entered into a Labor Dispute Settlement Agreement (LDSA). A primary purpose of the LDSA was to "resolve all litigation . . . arising from, related to or connected with the 1991-1998 labor dispute." (*Winnett* Docket No. 448 at 22.) In that agreement, the UAW agreed to cease "funding or otherwise supporting, directly or indirectly, any litigation filed by itself, its members or third parties against Caterpillar . . . arising out of, or related to or connected with the Labor Dispute," that is, the period from November 1991 to March 1998. (*Id.*) As discussed previously, the LDSA explicitly provides that claims arising after ratification of the 1998 CLA are not sufficiently connected to the Labor Dispute to implicate this provision. 583 F. Supp.2d at 903; *Kerns* Docket No. 94 Ex. 8 at 1.

### F.     The 2004 Agreement and Costs Directly Imposed

In late 2003 and early 2004, with the VEBA money close to exhausted, Caterpillar and the UAW commenced negotiations over a successor labor contract. The parties agreed to terms on the successor agreement in 2004, and that labor contract became effective on January 10, 2005. Under this agreement, in lieu of a VEBA plan, Caterpillar agreed to pay 40 percent of the "above the cap" health care costs for retiree medical coverage, as well as the "below the cap" cost. The agreement also included medical benefit plan design changes, such as the imposition of deductibles and increased co-pays.

After considerable negotiations on the issue, the 2004 labor contract removed the "without cost for life" language pertaining to surviving spouse medical benefits that, in form and/or substance, had been in every previous labor agreement discussed herein. Indeed, the

10

2004 GIP contains new language that clearly specifies that both retirees and their surviving spouses must contribute toward their medical costs.

In October 2004, Caterpillar began directly charging post-1992 retirees monthly premiums associated with retiree medical costs in excess of the contractual caps. Caterpillar maintains that it began deducting premiums "at a much earlier time," but the effect of the deductions was obscured by the fact that VEBA was covering the costs while it was funded. (*Winnett* Docket No. 436 at 40.) The plaintiffs maintain that Caterpillar made a series of "tenuous" announcements during the 1999-2003 time period, indicating that, while the VEBA might one day be depleted, it was not a foregone conclusion that health insurance premiums would ever actually be paid by retirees, and, therefore, it was not until this 2004 time period that Caterpillar's changes "hit home."

In October 2005, Caterpillar representatives began mailing letters to surviving spouses indicating that, effective January 1, 2006, they would be required to pay a health care premium to maintain their coverage. Shortly thereafter, Caterpillar began receiving objections from some of these surviving spouses, arguing that, based upon Caterpillar's previous representations, they were entitled to "without cost for life" coverage. These surviving spouses pointed to, among other things, letters that Caterpillar had sent them following the death of their spouse, assuring them that they would be entitled to coverage, for life, "without cost."

In April 2006, shortly after the *Kerns* lawsuit was filed, Caterpillar announced that it would "waive" premiums for those individuals whose spouse retired (or was eligible to retire) from Caterpillar between January 1, 1992 and January 10, 2005 and then died prior to January

11

10, 2005, the effective date of the 2004 labor agreement. Caterpillar continues to charge monthly premiums (usually well in excess of $100 per month) for those surviving spouses whose Caterpillar-retiree spouse died after January 10, 2005, that is, after the labor agreement that removed the "without cost" language as to surviving spouses was ratified. Regardless of the date of the death, however, Caterpillar, pursuant to the 2004 CLA, charges the surviving spouse a $300 deductible before health insurance applies and 10 percent of the post-deductible costs, up to an out-of-pocket maximum of $750 per year.

Beginning in 2006, Caterpillar began assessing additional charges to the CLS subclass under the 2004 CLA. That is, deductibles of $300 per individual or $600 for families before health insurance could apply, deductibles and new costs for dental and vision coverage, along with 10 percent of the costs of treatment up to an out-of-pocket maximum of $750 for an individual and $1500 for a family per year.

### i. The 2004 Agreement - limitations on UAW's conduct

The 2004 IPA also provides limitations on the UAW's conduct. Specifically, it states that the UAW shall not "engage or continue to engage in or in any manner sanction or encourage any strike, work stoppage, slowdown, or other interruption or impeding of work, or engage or continue to engage in any other use of economic force for the purpose of securing any modification, change, or termination of [the IPA or GIP], or for the purpose of securing the establishment of any new, different or additional plan for insurance or other benefits for death, sickness, accident, hospitalization or surgical or other medical services, or other welfare plans for the benefit of Employees or retired Employees, or the Dependents of either." (*Winnett*

12

Docket No. 435 at 14-15.)

### G.    The UAW's Conduct as to This Litigation

As has been discussed in previous opinions, one issue in this case is whether the UAW has breached contractual agreements (specifically the LDSA and the 2004 IPA) with Caterpillar by providing support to the plaintiffs in this dispute.  It is undisputed that the UAW sponsors the *Kerns* litigation, and that the UAW has retained Roger McClow and his firm to represent the plaintiffs in *Kerns*.

The UAW is not funding the *Winnett* lawsuit, has not retained counsel to represent the plaintiffs in the *Winnett* lawsuit, has informed local unions that it does not sponsor the *Winnett* lawsuit, and the UAW is not paying the attorneys' fees and expenses of *Winnett* counsel.  Prior to the filing of the *Winnett* lawsuit, UAW's general counsel's office contacted Michael Mulder, an attorney for the *Winnett* plaintiffs, and advised him of "potential pitfalls" in pursuing the *Winnett* case.

The UAW does recognize that, on a couple of occasions in 2006, senior representatives from the UAW encouraged an individual plaintiff, Michael Finn, who was pursuing a similar case against Caterpillar in a federal district court in Illinois, to dismiss his Complaint in Illinois and to re-file his Complaint in this District, where it would be consolidated with *Winnett,* all of which happened.  Additionally, in March 2005, McClow, at the request of individual Caterpillar workers in Peoria, Illinois visited with Caterpillar retirees for the purpose of developing a possible retiree lawsuit, but he ultimately elected not to represent those individuals.  And, prior to the filing of the *Winnett* suit, McClow was retained by the UAW to be the Union's "eyes and

13

ears as to what was going on with that lawsuit." (*Winnett* Docket No. 448 at 5.) There is also no dispute that, in the time prior to the filing the *Winnett* suit, various locals sent requests to the UAW to look into their complaints about Caterpillar, and the UAW did fact-finding as to the complaints from the locals.

Caterpillar also claims that the UAW has provided support to the *Winnett* plaintiffs as the litigation has proceeded. For instance, current and retired UAW officials provided affidavits in support of the *Winnett* plaintiffs' position on the motion to transfer, and UAW officials contacted the entity that administered the VEBA to determine whether Caterpillar charged the VEBA for coverage provided to surviving spouses. Caterpillar claims that this information has been useful to the plaintiffs in pursuing this litigation. (Docket No. 448 at 5, 10.)

### H.     Procedural History

#### I.     *Winnett*

The *Winnett* plaintiffs filed their Complaint in this court on March 28, 2006. The *Kerns* plaintiffs filed their lawsuit on April 13, 2006 in the Western District of Tennessee. (Docket No. 243 at 42.) The *Kerns* litigation was transferred to this court on November 16, 2006. Since that time, this court and the Sixth Circuit have issued rulings that greatly influence the court's ruling here on the parties' summary judgment motions.

First, on May 16, 2007, this court denied Caterpillar's Motion to Dismiss in *Winnett. See Winnett v. Caterpillar*, 496 F. Supp.2d 904 (M.D. Tenn. 2007). In that opinion, after determining that the court had jurisdiction, the court determined that the relevant 1988 agreements created "a vesting right in the benefits at issue" and that those rights "vested when

the employees attained retirement or pension eligibility." *Id.* at 921-22. The court also concluded that the *Winnett* plaintiffs' claims were timely under the relevant six-year statute of limitations because the "indefinite and contingent" nature of Caterpillar's communications from 1992 to 2003 would not make it clear to the plaintiffs that they had suffered an injury until Caterpillar actually began making the challenged deductions directly from the employee in 2004, after the VEBA was exhausted. *Id.* at 927-28. Lastly, the court raised concerns about Count V, which alleged that Caterpillar violated ERISA Section 102 by not putting forth a compliant SPD following the December 1992 unilateral implementation (indeed, not putting forth a new SPD until 1999). *Id.* at 928-29. The court did not dismiss the count, but raised concerns that discovery would show that the relief sought was "duplicative" of other counts and that, through Count V, the plaintiffs were impermissibly seeking to obtain substantive relief for an alleged procedural violation of ERISA. *Id.*

On July 20, 2007, the court granted Caterpillar's motion to certify an appeal of the court's ruling to the Sixth Circuit. *Winnett v. Caterpillar*, 2007 WL 2123905 (M.D. Tenn. July 20, 2007). In that opinion, the court stated that it had previously "rejected Caterpillar's argument that actual retirement was necessary for vesting." *Id.* at *2. But, in light of the facts that (1) "most of the plaintiffs" in *Winnett* "ground their rights to lifetime no-cost retiree medical benefits" in the 1988 contracts, (2) the 1988 labor contracts expired on November 3, 1991, and (3) the plaintiffs and their putative class members all retired after November 3, 1991, the court recognized that much of the *Winnett* case rested on the court's conclusion that the rights "vested" prior to retirement. *Id.* at *4-6. Therefore, the court certified an appeal on this issue to the Sixth

Circuit. *Id.* at *7.

Shortly before certifying the appeal, the court granted the *Winnett* plaintiffs' motion for class certification. *Winnett v. Caterpillar*, 2007 WL 2044098, *1 (M.D. Tenn. July 12, 2007). Under Federal Rule of Civil Procedure 23(b)(1)-(2), the court certified a main class of retirees and surviving spouses "who are or were participants or beneficiaries in Caterpillar's plan that provided for retiree medical insurance benefits; (2) for whom the UAW had been the employees' collective bargaining representative at the time of their retirement from Caterpillar,; and (3) who began working for Caterpillar prior to the expiration of the 1988 labor agreement and who retired on or after January 1, 1992, and before March 16, 1998, and became eligible for the immediate commencement of a monthly pension (with at least five years of credited service) under the Non-Contributory Pension Plan upon retirement; and, in the case of beneficiaries of such retirees, who is a surviving participant spouse whose employee spouse fulfilled the conditions above leaving a spouse with a survivor pension." *Id.* at *2. The court also granted the *Winnett* plaintiffs' motion to certify three subclasses, that is, "(1) members of the main class who were eligible to retire prior to January 1, 1992; (2) members of the main class who worked (or whose employee spouses worked) under the CLS Agreement, and (3) members of the main class who are surviving spouses of Caterpillar retirees." *Id.* at *13.

On September 23, 2008, the Sixth Circuit ruled on Caterpillar's appeal in *Winnett.* The Sixth Circuit recognized that most of the claims in *Winnett* turn "on whether a 1988 collective labor agreement provided workers with a right to no-cost retiree medical benefits that vested *as soon as* the worker became eligible for retirement or a pension," and, reversing this court, the

16

Sixth Circuit held "that it did not." 553 F.3d 1000, 1002 (emphasis in original). The Sixth

Circuit concluded that, under the plain language of the 1988 labor agreement documents, "a

claim based on retiree medical benefits vesting before workers retired fails as a matter of law."

*Id.* at 1008. The Sixth Circuit focused on the "fundamental difference" between future retirees

and active retirees, that is, workers who have not retired remain represented by a union and are

free to choose whether to retire under the labor agreement in place at that time or whether to wait

to retire and take their chances that the union will get them better terms in the next agreement.

*Id.* at 1010. The Sixth Circuit, while recognizing that the CLS subclass members and the

surviving spouses may continue to have viable claims "based on separate contractual provisions

and distinct facts," directed this court to dismiss the plaintiffs' claims "which depend exclusively

on the theory that retiree medical benefits vested before retirement." *Id.* at 1012.

While the appeal of the court's ruling on Caterpillar's motion to dismiss was pending

before the Sixth Circuit, the court, after a three-day evidentiary hearing, granted the *Winnett*

plaintiffs' Motion for Preliminary Injunction as to the CLS subclass. *Winnett v. Caterpillar*, 579

F. Supp. 2d 1008 (M.D. Tenn. Sept. 16, 2008). The court found that, "to succeed on the merits

of their claim, the CLS subclass must show that the CLS Agreement extended the 1988 CLA

beyond its expiration for the CLS subclass such that they retired under that contract and that the

1988 GIP provided a vested right to lifetime no-cost retiree benefits." *Id.* at 1022-1023. The

court found that the CLS agreement, unambiguously, extended the 1988 CLA for the CLS

subclass such that they retired under the 1988 CLA. *Id.* at 1025-27. Also, the court found that,

unambiguously, the 1988 GIP provided a vested right to lifetime retiree health benefits, and that

17

this finding was supported by the extrinsic evidence produced during the evidentiary hearing. *Id.* at 1032 ("even if the language of the GIP were ambiguous, there is also extrinsic evidence that indicates the parties intended the benefits to vest.")

The court also rejected a number of affirmative defenses that Caterpillar continues to advance in this litigation. Again, as to the six-year statute of limitations, the court found that the CLS subclass would not have clearly known that they had "suffered an injury" until 2004, when the VEBA was exhausted and Caterpillar actually began making the "challenged deductions," that is, rather than earlier, when Caterpillar instituted the NetWork, made small adjustments or sent messages implying that, in the near future, Caterpillar retirees would be responsible for premiums. *Id.* at 1040-41. ("Essentially, 'no cost' retirement health care to which the plaintiffs were entitled was still available if the retiree stayed in NetWork."). The court also rejected Caterpillar's estoppel defense. *Id.* at 1042. After concluding that the CLS subclass had a substantial likelihood of succeeding on the merits, rejecting these affirmative defenses, and accounting for the other factors relevant to a motion for preliminary injunction, the court issued a preliminary injunction against Caterpillar, in favor of the CLS subclass.[5]

---

[5] Specifically, the court stated that "Caterpillar must provide the CLS subclass with the same level of retiree healthcare currently provided to Caterpillar retirees for whom the UAW had been the employees' collective bargaining representative at the time of their retirement from Caterpillar and who retired before January 1, 1992. Caterpillar is enjoined from deducting premium charges for the CLS subclass' retiree healthcare coverage and from charging the CLS subclass the following special charges, which are not part of the 1998 'Caterpillar Hourly Retirees Central Agreement Covered under the NetWork' Plan: premiums to maintain their retiree healthcare benefit; deductibles of $300 (individual) or $600 (family) before the health insurance applies; the retiree's share of a 90/10 split and maximum out-of-pocket payments, which require the CLS subclass to pay 10% of the costs of their post-deductible health care until the amount reaches the out-of-pocket maximums of $750 (individual) or $1500 (family); and

18

### ii.    *Kerns*

On June 27, 2007, the court denied Caterpillar's Motion to Dismiss the *Kerns* litigation. *Kerns v. Caterpillar*, 499 F. Supp. 1005 (M.D. Tenn. 2007). In *Kerns*, the plaintiffs are surviving spouses of former employees of Caterpillar who retired on or after March 16, 1998 and before January 10, 2005. In ruling on the motion, the court indicated that there was significant evidence that the surviving spouses had a vested right to "no cost" health care under the labor agreements at issue and concluded that the proposed class only applied to "surviving spouses," although "a person who is presently the spouse of a living retiree might become a class member in the future, if and when he or she should meet the class definition and become a surviving spouse." *Id.* at 1020-23.

The court also rejected Caterpillar's argument that the *Kerns* claims are moot. That is, while Caterpillar maintains that it is not charging premiums to individuals whose retiree-spouse died prior to March 10, 2005, as indicated above, Caterpillar maintains that it has a legal right to charge these premium payments. Also, under ERISA, the plaintiffs are entitled to "clarify their rights to future benefits under an ERISA plan" and to challenge "benefit modifications" that Caterpillar has already made, in terms of higher prescription drug co-payments, new deductibles, new out-of-pocket maximums, and related charges. *Id.* at 1024-25.

On July 12, 2007, the court granted the plaintiffs' motion for class certification. *Kerns v.*

---

individual and family deductibles for dental services and new costs for their vision plan." 579 F. Supp. 2d at 1043. The court subsequently denied Caterpillar's Motion to Stay the preliminary injunction pending appeal. *Winnett v. Caterpillar*, 2008 WL 5050103, *1 (M.D. Tenn. Nov. 20, 2008). Caterpillar has appealed the preliminary injunction ruling and that appeal is pending before the Sixth Circuit. (*Winnett* Docket No. 310.)

*Caterpillar*, 2007 WL 2044092, *1 (M.D. Tenn. July 12, 2007). Pursuant to Federal Rule of Civil Procedure 23(b)(1)-(2), the court certified a class of "surviving spouses of former hourly employees: (1) who were represented by the UAW in collective bargaining; (2) who retired from Caterpillar on or after March 16, 1998 and before January 10, 2005, and (3) whose employment at Caterpillar's facilities in Memphis, Tenn., York, Penn., Denver, Colorado, and Aurora, Peoria, East Peoria, Mapleton, Mossville, Morton, Decatur, and Pontiac, Illinois was governed by the CLAs and the related collective bargaining agreements." *Id.* at *2. Again, the court ruled that the class could not include living spouses. *See id.*

   **iii.**  **UAW**

   Caterpillar filed a third-party Complaint against the UAW and various local unions in both *Winnett* and *Kerns* in 2007. (*Winnett* Docket No. 150; *Kerns* Docket No. 82.) The UAW and the local unions moved to dismiss. On May 1, 2008, the court dismissed most of the claims asserted by Caterpillar, allowing only Caterpillar's breach of contract claims against the UAW to proceed and only on the theory that the UAW breached the 2004 labor agreements (Count III) and the LDSA (count IV) by actively "encouraging and supporting" the *Winnett* and *Kerns* lawsuits. *See Kerns v. Caterpillar*, 583 F. Supp. 2d 885, 902-04 (M.D. Tenn. 2008).[6]

              **ANALYSIS**

---

[6]In decisions that apply to both cases, the court also (1) ruled that the plaintiffs are not entitled to a jury trial on their claims (and the plaintiffs' trial against Caterpillar would be bifurcated) and (2) severed the trial of the third-party proceedings from the case asserted by the plaintiffs against Caterpillar. 2009 WL 3839755 (M.D. Tenn. Nov. 16, 2009); 2010 WL 424914, *5 (M.D. Tenn. Jan. 28, 2010).

The plaintiffs in *Winnett* and *Kerns* seek lifetime no-cost retiree health care benefits. Their claims are brought under Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, and under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).[7] The defendant/third-party plaintiff, Caterpillar, alleges that third-party defendant, the UAW, breached a pair of agreements between the parties by supporting the plaintiffs' litigation, and, therefore, among other things, Caterpillar is entitled to damages and indemnification. The plaintiffs and Caterpillar have moved for summary judgment against each other, and the UAW has moved for summary judgment on Caterpillar's breach of contract claims.

I.      **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.

---

[7]Section 301 of the LMRA states: "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction . . . ." 29 U.S.C. § 185(a). Section 502(a)(1)(B) of ERISA states that a "civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

21

2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]."  *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249, 252.  An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.      The Plaintiffs' Claims

### A.      *Winnett*

The plaintiffs argue that, even in light of the Sixth Circuit's ruling, there are still four avenues of recovery available to this class or subclasses.  That is, the plaintiffs seek summary judgment as to liability for (1) the group of class members who retired between January 1 and December, 1992, who had the terms of the 1992 unilateral implementation imposed upon them retroactively; (2) the CLS sub-class, (3) the surviving spouse subclass, and (4) a claim on behalf of the class as a whole to vested, no-cost health insurance under the 1988 SPD.  (Docket No. 405 at 1-2.)

#### i.      The January 1-December 1992 subgroup

The plaintiffs claim that the 744 class members who retired between January 1, 1992 and

December 1, 1992 are entitled to benefits under the 1988 Plan because "Caterpillar could not retroactively strip persons who had already retired of their vested health care benefits." (Docket No. 405 at 6.) The plaintiffs argue that retroactively applying an amendment to a collective bargaining agreement that would reduce benefits might render the contract illusory and it also would be inconsistent with the notion that benefits "vest" and cannot be taken away once employees retire. (*Id.* at 6-7.)(citing for controlling authority *Wulf v. Quantum Chem. Corp*, 26 F.3d 1368, 1378 (6th Cir. 1994)). *Wulf* stands for the proposition that, once a right becomes vested in the employee, an agreement that retroactively takes those rights away could very well be illusory. *See id.* Moreover, the plaintiffs suggest that it is unfair for Caterpillar to attempt to "claw back" retiree benefits through retroactive application.[8] (Docket No. 405 at 8.)

In response, Caterpillar argues, correctly, that the "1988 contract expired before the Pre-December 1992 Group Retired," that is, there is no dispute that the 1988 Agreement terminated on November 3, 1991. (Docket No. 439 at 2.) Therefore, under the Sixth Circuit's holding in *Winnett*, the individuals in this sub-group retired outside of the 1988 Agreement, and their "retirement package . . . change[s] with the expiration of their collective labor agreement," that is, their retirement benefits did not vest under the 1988 Agreement because they did not retire under that Agreement. *Winnett*, 535 F.3d at 1011 (internal quotation omitted). While,

---

[8] The plaintiffs also argue that the language in the 1988 IPA, discussed above, that "Termination of the Agreement shall not have the effect of automatically terminating the Plan," referring to the GIP, indicates that the November 3, 1991 termination did not have the effect of terminating this subgroup's right to benefits under the 1988 Plan. (Docket No. 405 at 7.) The Sixth Circuit considered this language (and another similar provision) in *Winnett* and concluded that this language was not sufficient to vest benefits under the 1988 Plan. 553 F.3d at 1009-10.

particularly in their reply briefing, the plaintiffs cite an array of case law in support of the court's having jurisdiction to hear this claim and argue this issue at considerable length from a legal and equitable perspective, they fail to address the basic issue, which is that the Sixth Circuit's *Winnett* opinion clearly forecloses recovery for this subclass.  (Docket No. 447 at 8-13.)

As to the plaintiffs' argument that retroactive application is unfair, while this court clearly has jurisdiction over this case, it does not have jurisdiction to consider this argument, which, in the context of this case, is an "unfair labor practice" argument and does not arise under ERISA or the LMRA, because the plaintiffs in this group retired outside of the 1988 Plan.  *See e.g. Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608-09 (6th Cir. 2004)("a federal district court does not have jurisdiction to determine whether an employer violates the NLRA by refusing to make contributions to a pension plan during contract negotiations, which is arguably an unfair labor practice.")  Therefore, the claims of this group are not viable, and Caterpillar is entitled to summary judgment on this aspect of the plaintiffs' case.[9]

ii.    **The CLS subclass**

The plaintiffs also seek summary judgment as to liability on the claims of the CLS subclass.  (Docket No. 405 at 9.)  As discussed above, at the preliminary injunction stage, the

---

[9]The plaintiffs also repeatedly mention that Caterpillar does not impose the 1992 CLA on individuals who retired between November 3, 1991 and December 31, 1991; rather they get the benefits of the 1988 CLA. (Docket No. 405 at 6.)  In *Winnett*, the Sixth Circuit cautioned against relying on extrinsic evidence that is "irrelevant to when a worker's right to retiree medical benefits vests."  553 F.3d at 1012.  Here, under the Sixth Circuit's holding in *Winnett*, rights under the 1988 labor agreements would not vest for anyone who did not retire under that agreement; how Caterpillar may have voluntarily chosen to treat one group of individuals, in this context, is not relevant to the vesting question as defined by the Sixth Circuit.

24

court concluded that the CLS subclass retired with vested benefits pursuant to the terms of the 1988 CLA. The plaintiffs' argument here essentially re-hashes the rationale that the court used to arrive at its conclusion, which is fully explained in the preliminary injunction Memorandum. (Docket No. 405 at 9-12.) In response, and in its own motion for summary judgment, Caterpillar makes essentially the same challenges and arguments that it made at the preliminary injunction and Motion to Dismiss stage. (Docket No. 439 at 7-9; Docket No. 413 at 16-19.)

As discussed above, after a thorough review of the relevant documents and agreements at the preliminary injunction stage, the court concluded that the CLS agreement *unambiguously* extended the 1988 CLA beyond its expiration for the CLS subclass such that they retired under that contract and that the 1988 GIP provided a vested right to lifetime "no-cost" retiree health-care benefits. Obviously, the language of the CLS Agreement has not changed in the intervening period between rounds of briefing. Therefore, the plaintiffs are entitled to summary judgment on the issue of *liability* as to this subclass.[10] That said, in the intervening period between the

---

[10] As to all remaining plaintiffs, Caterpillar re-hashes its argument that the claims are time-barred and barred by the doctrine of estoppel. (Docket No. 439 at 21-25.) As to the statute of limitations issue, as discussed in the preliminary injunction opinion, the relevant issue under both ERISA and the LMRA is "when the plaintiffs should have become aware of Caterpillar's alleged breach of its contractual obligation," and the court determined that, the "indefinite and uncertain" language that Caterpillar had used regarding caps and potential future costs, the *de minimis* nature of some additional charges, and the fact that no-cost health care was essentially still available if the patient remained in the NetWork all indicated that it was not until October 10, 2004, when Caterpillar started directly charging the plaintiffs, that "the clock" began to run, and, therefore, the claims were not barred by the six-year statute of limitations. 579 F. Supp. 2d at 1039-42. In largely relying on past arguments, Caterpillar has offered nothing that would persuade the court to decide this question differently here, and this conclusion extends to the "surviving spouse" subclass in *Winnett* and the *Kerns* class as well, as these groups were likewise not subject to direct charges until well within the six-year window. Caterpillar also re-hashes its estoppel argument, arguing that, under this "flexible" doctrine, in fairness, the

25

issuance of the preliminary injunction and the briefing here, the Sixth Circuit issued an opinion that has considerable impact on the *scope* of liability. *See Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. July 27, 2009)

 At issue in *Reese* was a collective bargaining agreement that also granted retirees lifetime health-care benefits upon retirement. *Id.* at 318. The agreement provided that "no contributions" would be required from employees "for the Health Care Plans." *Id.* As here, as health care costs skyrocketed, the employer in *Reese* and the union bargained for certain adjustments to the health care benefits scheme, including a preferred-provider network that threatened to increase certain costs for individuals who retired under the Health Care Plan. A class of retirees sued, seeking a declaratory judgment that they were entitled to life-time health care and that their benefits could not be reduced. *Id.*

The first issue was the whether the benefits provided by the labor agreement vested. *Reese* explains, as this court has in previous opinions, that, in resolving a claim for vested health care benefits stemming from a collective bargaining agreement, the court uses basic canons of contractual interpretation, looking to the "explicit language" of the agreement for "clear manifestations of intent" to vest. That is, based upon the entire contract, the court examines whether the language of the contract indicates that the parties intended to make benefits under

plaintiffs should not be allowed to retain the benefits of the 1998 and 2004 plans without accepting the costs. (Docket No. 439 at 24-25.) In the preliminary injunction opinion, the court rejected this argument on the theory that improvements to benefits over time are expected in the labor negotiation context and "do not undermine the principle that vested benefits cannot be altered without the retirees' consent." 579 F. Supp. 2d at 1042. There is no reason to deviate from this conclusion here, and this conclusion is extended to the "surviving spouse" subclass in *Winnett* and the *Kerns* class as well.

the contract unalterable by subsequent labor agreements. *Id.* at 321; *Yotlon v. El Paso Tenn. Pipeline*, 435 F.3d 571, 578-79 (6th Cir. 2006). As noted above, as to the basic vesting question, under *Reese*, there is nothing for the court to re-consider, as the court applied this analysis previously and determined that there was an unambiguous intent to vest. *See Winnett*, 579 F. Supp. 2d at 1023-32.

However, as Caterpillar correctly points out, *Reese* recognizes that health care benefit plans present a unique issue, as labor agreements often lack precision on the issue, and bargainers frequently "have a history" of altering benefits over the course of the labor relationship. 574 F.3d at 324. Indeed, in *Reese*, while the labor agreement said "no contributions" from the retiree would be required, "no party to the case – the union, the employer, the retirees – viewed the benefits in this way." *Id.* That is, even if the plan states "no contributions," it is not appropriate, in light of practical reality, to conclude that the health coverage obtained by someone who retired under a "no contributions" scheme "would be fixed and irreducible into perpetuity for all employees who retired under it." *Id.* at 325. Rather, a "no contributions" scheme, "at best, under our cases, establish[es] a right to lifetime health-care benefits, but not benefits that could not change from CBA to CBA." *Id.* In short, *Reese* stands for the proposition that, even if the retiree has a vested right to lifetime health benefits from his employer, unless there is some exceptional language that dictates that benefits can "never vary," that retiree is entitled to "lifetime benefits subject to reasonable changes." *Id.* at 326.

The court went on to state that "this conclusion makes sense not only in the narrow circumstances of this case but also within the broader context of ERISA, which contemplated

27

just this sort of flexibility." *Id.* Indeed, citing House Reports from the time of the passage of ERISA, the court concluded that deeming "ancillary benefits" vested would "seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." *Id.* at 326-27 (internal quotation omitted). The matter of these "ancillary benefits," going forward – contract to contract – , is "left to employers, employees and unions to handle by contract." *Id.* at 327.

In conclusion, the court in *Reese* stated that, while the plaintiffs were entitled to vested lifetime retiree health benefits, they had no entitlement to health benefits "maintained precisely at the level provided for" by the collective bargaining agreement under which they retired. *Id.* That is, while the former employer "cannot terminate all health-care benefits for retirees," it "may reasonably alter them." *Id.* The Sixth Circuit then "le[ft] it to the district court to decide how and in what circumstances" benefits may be altered and "to decide whether it is a matter amenable to judgment as a matter of law or not." *Id.*

As noted above, in issuing the preliminary injunction, this court concluded that the CLS subclass was entitled to health care benefits under the 1988 CLA and enjoined Caterpillar "from deducting premium charges for the CLS subclass' retiree healthcare coverage and from charging the CLS subclass the following specific charges . . . deductibles of $300 (individual) or $600 (family) before health insurance applies; the retiree's share of a 90/10 split and maximum out-of-pocket payments, which require the CLS subclass to pay 10% of the costs of their post-deductible health care until the amount reaches the out-of-pocket maximums of $750 (individual) or $1500 (family); and individual and family deductibles for dental services and new

28

costs for their vision plan." 579 F. Supp. 2d at 1043.

Plainly, the intervening *Reese* decision dictates that a retiree's vested right to health coverage from his employer is subject to reasonable changes to "ancillary" aspects of the plan. Therefore, *Reese* cannot be read consistently with some of the restrictions set forth in the preliminary injunction. That is, adjustments to vested retiree benefit coverage that resulted in a relatively modest deductible and out-of-pocket maximum costs cannot be viewed, in light of *Reese*, as unacceptable. This is particularly so because, as discussed above and as in *Reese*, health care coverage, even for retirees under the 1988 CLA, has never actually been no cost; that is, as recognized by all parties, co-pays and charges for office visits have always been a part of the costs borne by retirees with vested benefits under the 1988 CLA.[11] (Docket No. 436 at 10, Docket No. 454 at 13.)

That said, charging significant monthly premiums (often well in excess of $100 per month) to the CLS subclass cannot be viewed as a "reasonable" or "ancillary" change. The 1988 CLA provided that health benefits will be provided at "no cost." Even if reasonable adjustments through continued collective bargaining resulted in other acceptable incidental medical costs, the imposition of monthly premium charges, *just to maintain the "no cost" benefit*, goes too far. The evidence in this case shows that these premiums impose considerable yearly costs on the retiree

---

[11]Indeed, testimony from class members and David Stevens (Senior Labor Relations Consultant for Caterpillar) during the preliminary injunction hearing demonstrated that, even under the 1988 Plan, retirees would have to pay for costs of the office visit to their doctor and a specialist, along with co-payments on prescription drugs. (Docket No. 298 at 256, 274, 365; Docket No. 299 at 549.) Indeed, at the close of testimony, the court stated that "what has become clear to me during this hearing is that [the CLS subclass members] all along have been paying a certain amount of their healthcare costs." (Docket No. 299 at 567-68.)

29

and, moreover, the imposition of a premium for the mere maintenance of health care coverage is flatly inconsistent with the letter and spirit of the notion that health care *coverage* will be provided at "no cost."

Therefore, the court will find that, as a matter of law, Caterpillar violated ERISA and the LMRA by charging premiums to CLS class members, and the court will continue to enjoin Caterpillar from charging health care premiums to the CLS class members. The other charges that were subject to the preliminary injunction must be recognized as alterable under *Reese*. Therefore, the court finds that these charges are permissible, and the court will lift the injunction (prospectively) as to these charges.[12]

### iii. Surviving spouse subclass

Next, the plaintiffs move for summary judgment on the issue of liability on the claims of the surviving spouse subclass, whose spouses all retired under the 1992 unilateral implementation. (Docket No. 405 at 12.) As noted above, the 1992 unilateral implementation (as well the agreement that came before and after it) provided that, referring to surviving spouses, "coverage will be continued following the death of a retired Employee for the remainder of [the] surviving spouse's life without cost." (*Id.* at 13.) The plaintiffs argue that this provision unambiguously provides the surviving spouse subclass with vested, no cost lifetime health insurance. (*Id.*) As the plaintiffs point out, the court, in the preliminary

---

[12]As the parties have not had an opportunity to brief the issue, the court will not take a position at this time as to whether Caterpillar is entitled to attempt to recoup funds expended in relation to the deductibles and other "ancillary" charges that the court enjoined Caterpillar from assessing through the preliminary injunction. Absent resolution by the parties, this would be an issue for consideration during any damages briefing.

injunction opinion, determined that this language, as contained in the 1988 labor agreement, provided considerable evidence that the parties intended these benefits to vest. *Winnett*, 579 F. Supp.2d at 1030.

In response, Caterpillar argues that, in 1992, these subclass members were not "surviving spouses," but dependents, and, therefore, the language does not apply to them. (Docket No. 439 at 10.) Also, Caterpillar claims that "there is no evidence to suggest the subclass members ever saw or considered the 1992 GIP document that contains the 'for life without cost' language," but there is evidence that they received materials indicating that Caterpillar would begin implementing caps on retiree benefits. (*Id.*) Also, Caterpillar contends that this provision must be "read in conjunction with other provisions that clearly contemplated cost-sharing," including those issued by Caterpillar during the lengthy labor dispute during which co-payment obligations, the NetWork, and caps were discussed. (*Id.* at 11.)

Simply put, the 1992 unilateral implementation means what it says. That is, while the language is in force, once a retired employee dies, the surviving spouse is entitled to "continued" coverage "without cost." This is precisely the type of "explicit language" and "clear manifestation of intent" that must be found before the court can conclude, as a matter of law, that the parties intended benefits to vest under the agreement. *Yotlon v. El Paso Tenn. Pipeline*, 435 F.3d 571, 578-79 (6th Cir. 2006). Caterpillar, for all of its efforts to find a way around the clear language, cannot point to a single provision in the 1992 unilateral implementation that negates the plain language discussed above. The language here is plainly unambiguous and indicates that the 1992 unilateral implementation provided surviving spouses with vested no-cost medical

31

benefits.[13]

Again, however, under *Reese*, the finding that the benefits have vested leaves open the question of the scope of those benefits.  First, as discussed above, Caterpillar argues that "the evidence demonstrates the surviving spouse subclass has suffered no actual injury attributable to premiums," because Caterpillar has "waived" premiums for this subclass.[14]  (Docket No. 413 at 24).  Indeed, Caterpillar contends that it "is not charging the surviving spouse subclass members for any premiums or other costs associated with the caps."  (Docket No. 439 at 12); *but see* Docket No. 451 at 10)(Caterpillar recognizing that it does charge premiums to a "handful of individuals" who "became surviving spouses during the term of the 2004 contract.")

Under the discussion above and *Reese*, Caterpillar is clearly prohibited from charging premiums to the *Winnett* surviving spouse subclass, because they have a vested right to "no cost" health care benefits and because, as concluded above, premiums are not a reasonably alterable

_____

[13] Caterpillar argues that "the failure to exclude the 'life without cost' language from the 1998 contract constitutes a mutual or unilateral mistake."  (Docket No.439 at 11.)  This argument is without merit, among other things, because the rights of the surviving spouses vested here under the 1992 unilateral implementation, which Caterpillar drafted and imposed, not the 1998 agreement.  *See also Spectrum Health v. Valley Truck Parts*, 2008 WL 5273627, *4 (W.D. Mich Dec. 17, 2008)("Valley Truck was not entitled to ignore the Plan's plain language, even if it were the result of an unintended drafting error."); *Humphrey v. United Way of Texas Gulf Coast*, 590 F. Supp. 2d 837, 848 (S.D. Tex. 2008)("in the ERISA context . . . drafting errors are strictly construed against the drafter of the plan document . . . to allow a plan drafter to reform an unambiguous ERISA plan because of its own unilateral mistake is not appropriate.")

[14] Throughout briefing, Caterpillar has maintained that its waiver of premiums rendered the complaints of this sub-group moot.  As discussed in the *Kerns* Motion to Dismiss opinion, because Caterpillar maintains that it has a legal right to charge premiums to this sub-group, and because, under ERISA, the plaintiffs are entitled to "clarify their rights to future benefits under the plan" and to challenge "benefit modifications" that Caterpillar has already made, the claims of these groups are not moot.  499 F. Supp. 2d at 1024-25; *see also Winnett*, 2007 WL 2044098, at *4-5.

32

benefit under a "no cost" scheme.[15]

As noted above, however, Caterpillar, pursuant to the 2004 CLA, does charge the surviving spouse a $300 deductible before health insurance applies and 10 percent of the post-deductible costs, up to an out-of-pocket cost of $750. (Docket No. 436 at 49-50.) These are essentially identical charges to those that the court found to be permissible under *Reese*, even though "no cost" health benefits vested for this sub-class. Therefore, through this opinion and subsequent order, Caterpillar is cautioned that it may not charge health insurance premiums to this subclass, but the "ancillary" costs from the 2004 CLA, about which the plaintiffs complain here, must be viewed as permissible under *Reese*.

### iv.    The 1988 SPD

The plaintiffs argue that the entire *Winnett* class is "entitled to vested no-cost retiree health insurance under the clear terms of the SPD in effect between October 31, 1991 and March 16, 1998." (Docket No. 405 at 17.) As noted above, the 1988 SPD provides that, "[i]f you retire and are eligible for the immediate receipt of a pension (with at least 5 years of credited service)

---

[15]As noted above, Caterpillar does charge a premium to certain surviving spouses, including those whose retiree-spouses died on or after March 10, 2005. As discussed in the *Kerns* section, the court concludes that the date of *retirement* determines whether the rights vested, not the date of death. Therefore, Caterpillar is not allowed to charge premiums to these *Winnett* surviving spouses, regardless of when their spouse died. While the plaintiffs claim that such surviving spouses are in the *Winnett* class (Docket No. 443 at 10), they recognize that it is not clear how many surviving spouses would fall into this category, and additional discovery will be necessary to determine the precise nature of the subclass and damages thereto. (Docket No. 405 at 12.)("As of December 1, 2006, there were approximately 545 class member survivors. By now, the number is undoubtedly greater as on that same date there were over 3,000 class member retirees who were married and living. Any disputes about the precise make-up of this subclass can be resolved in the damage phase of the case when further information from the defendant will be available.")

33

under the Non-Contributory Pension Plan, you will be eligible for the Retired Medical Benefit Plan, continued at no cost to you."  (Docket No. 431 at 14.)

The plaintiffs argue that, because a new SPD was not issued until 1999, the language in the 1988 SPD controls and, therefore, the entire class, which had all retired by the time of the 1999 SPD, is entitled to vested no-cost health benefits pursuant to the 1988 SPD.  (Docket No. 405 at 18.)  In support, the plaintiffs rely on a series of cases in which the Sixth Circuit found that, between conflicting language in an SPD and an *active* labor agreement, the language in the SPD controlled.  *See Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 250 (6th Cir. 1996); *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557, 564 (6th Cir. 2007).  The plaintiffs then launch into a lengthy discussion of two notices that Caterpillar did issue to UAW-represented Caterpillar employees that described the changes to retiree benefits brought about through the 1992 unilateral implementation.  (Docket No. 405 at 19-25.)  The plaintiffs challenge these notices as "misleading and incomplete" and argue that they did not provide the relevant employees with a good understanding of the benefit plan changes.  (*Id.*)

As discussed above, while the court did not dismiss this claim ("Count V") at the Motion to Dismiss stage, it did express considerable concern that the plaintiffs were attempting to obtain substantive relief for a procedural violation of ERISA, which is not permitted.  *Winnett*, 496 F. Supp. 2d at 928.  That is, even if Caterpillar did not comply with ERISA's procedural requirements to specify "the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" by (1) not timely issuing an SPD after the 1992 unilateral implementation or (2) by providing an unclear explanation of the changes to the 1988 CLA,

34

substantive recovery for these procedural violations is not permitted.  *Id.* at 929 (citing *Lake v. Metro Life Ins. Co.*, 73 F.3d 1372, 1378 (6th Cir. 1996); *see also* 29 U.S.C. § 1022(b); *Sears v. Union Central Life Ins. Co*, 222 Fed. Appx. 474, 478-79 (6th Cir. 2007) (because failure to issue an SPD is a procedural violation, injunctive or substantive relief was not recoverable).

It is clear from the plaintiffs' briefing that the initial concerns raised by the court three years ago were well-founded.  This claim, at bottom, alleges that Caterpillar's SPD-issuing policy during this time period was flawed and provided improper notice.  This claim seeks substantive and injunctive relief for a procedural violation, and, therefore, the claim is not permitted.  Moreover, the Sixth Circuit, in *Winnett*, found that, through the reservation of rights clause in the 1988 SPD, "the company may discontinue the retirement benefits of employees *who have yet to retire* when the agreement [not the SPD] ends."  *Winnett*, 553 F.3d at 1010 (emphasis in original)(internal quotation omitted).  Therefore, under settled ERISA law and the Sixth Circuit's holding in *Winnett*, the issues surrounding the timing of the SPD and the notice provided to the class cannot provide the relief sought here, and Caterpillar is entitled to summary judgment on this issue.

**B.**     ***Kerns***

As noted above, the *Kerns* class is comprised of individuals who are surviving spouses of Caterpillar employees who retired between March 16, 1998 and January 10, 2005.[16]  That is, all

---

[16]At one point, the plaintiffs also assert that "surviving spouses of deceased employees who died while eligible to retire on or after March 16, 1998 and before January 10, 2005 have a vested right to lifetime health benefits . . . regardless of the expiration of the contract."  (Docket No. 218 at 3.)  This group of individuals is facially outside of the scope of the class that was certified, all three class representatives' spouses retired from Caterpillar, and argument did not

of the class members' spouses retired under a collective bargaining agreement that provided that health care benefits "will be continued following the death of a retired Employee for the remainder of the surviving spouse's life without cost." (Docket No. 243 at 12.) As discussed above in the surviving spouse section in *Winnett*, the court has concluded that this language is sufficient to unambiguously vest in the surviving spouse a right to lifetime "no cost" health benefits.[17]

Caterpillar offers a series of affirmative defenses, most of which have been, in large part, addressed in the *Winnett* discussion. Again, the court finds no merit in Caterpillar's "mistake" argument. That is, given the unambiguous language of the agreement and given that this language was repeated time and time again, Caterpillar's argument that this specific language as to surviving spouses was left in in error is not viable.[18]

_____

focus on these individuals, so it is not clear on what grounds the plaintiffs seek relief for these individuals.

[17] In the Motion to Dismiss opinion, the court noted that, at that stage, despite "strong evidence" of an intent to vest, it would be premature "to rule on the merits as to whether the plaintiffs have a vested right in the lifetime benefits they seek." *Kerns*, 499 F. Supp. 2d at 1019. As discussed above, in light of the full record at the summary judgment stage, the court concludes that, using standard canons of contractual interpretation, the language "will be *continued* following the death of a retired Employee for the remainder of the surviving spouse's life without cost," unambiguously demonstrates an intent to vest the benefits for the surviving spouse.

[18] While it is not necessary to consider extrinsic evidence here, the extrinsic evidence submitted plainly supports the plaintiffs' position that there was no mistake. *See Cole v. ArvinMeritor*, 549 F.3d at 1064, 1075 (6th Cir. 2008)(where the contract language is unambiguous, the court is to apply that language without recourse to extrinsic evidence.) As discussed in previous opinions, the *Kerns* plaintiffs have submitted letters from Caterpillar to class members upon the death of their spouse in which Caterpillar represents that health care coverage will continue at "no cost," and the plaintiffs have also submitted evidence that appears to show that Caterpillar did not charge the VEBA for surviving spouse premiums. (*See* Docket

Caterpillar also, as in *Winnett*, argues that the claims here are time-barred. (*See* Docket No. 246 at 13; Docket No. 219 at 4.) The court has repeatedly explained why these claims are not time-barred, and there is no reason to reiterate that discussion here.[19] Caterpillar also argues, again, that the claims of the surviving spouses are moot. (*See* Docket No. 219 at 8.) The court has also repeatedly addressed this issue and concluded that, because, among other things, the plaintiffs are entitled to seek declaratory relief under ERISA, and because Caterpillar still asserts that it has the right to withhold premiums and other benefits from the surviving spouses, the claims of this group are not moot. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)(mootness is not implicated unless the facts make it "absolutely clear" that the challenged conduct will not reasonably recur).

That said, there is no dispute that, for class members whose spouse retired and then died all between 1992 and 2005, "Caterpillar is not charging . . . for any premiums or other costs associated with the caps." (Docket No. 240 at 16.) Caterpillar maintains, however, that it is permitted to (and does) charge premiums to surviving spouses whose spouse retired from Caterpillar prior to the ratification of the 2004 labor agreement but died after that agreement was ratified. (*Id.* at 17-18.) Caterpillar argues that any claims by this portion of the *Kerns* class are

_____

Nos. 223 Ex. 10; Docket No. 218 at 13.) In response, Caterpillar largely relies on self-serving deposition testimony from its own representatives, while conceding that the VEBA was not charged for surviving spouses and that it sent the letters discussed above to surviving spouses.. (Docket No. 246 at 7-13; Docket No. 219 at 6-7.)

[19]The court does find that, contrary to the *Kerns* plaintiffs' argument, Caterpillar did not waive the statute of limitations defense by not asserting it in its answer, as the *Kerns* class has failed to show prejudice from the omission and, given the prominence of this issue in the related *Winnett* case, prejudice would be very difficult to show. *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d at 1439, 1445 (6th Cir. 1993).

foreclosed by the Sixth Circuit's opinion in *Winnett.* That is, Caterpillar argues that, because *Winnett* holds that one must retire under the Plan in order to vest in retiree benefits under it, in order to qualify for "surviving spouse" retiree benefits, the individual must fully qualify as a "surviving spouse" during the term of the plan, that is, the spouse must retire and die during the term of the Plan. (*Id.* at 19.)

The court does not read *Winnett* this broadly. The primary issue before the Sixth Circuit in *Winnett* was whether rights could vest while the employee was "in service," and the court concluded that they could not, largely because there is a "difference between retired workers and those who are still represented by a union." That is, workers must "balance the certainty of particular retirement benefits against the potential to keep earning money, while accepting the risk that a future collective bargaining agreement's retirement benefits may not be as favorable." 553 F.3d at 1010-11.

Caterpillar's interpretation, that *Winnett* stands for the proposition that all "contingencies upon which their right to benefits depended" must be met during the period that the agreement is in force, is simply not supported by the primary rationale for the *Winnett* decision. Indeed, the decision more clearly stands for the proposition that the "key moment" at which future benefits vest is the moment of retirement. (Docket No. 253 at 15-16.) Therefore, the court concludes that a surviving spouse is not precluded from relief simply because her retiree-spouse happened

38

to die after the ratification of the 2004 agreement.[2021]

The court has concluded that lifetime benefits vested for the *Kerns* class and Caterpillar has no viable affirmative defenses. The court, then, turns to the *Reese* analysis to determine whether the changes to the benefit plans at issue here run afoul of the dictates of that decision.

Consistent with the discussion above, the *Kerns* class does not primarily complain about premium costs because Caterpillar has waived premiums for most of class. Rather, the class complains that, "effective January 1, 2006, Caterpillar reduced the health care benefits for surviving spouses by: (1) imposing new deductibles, co-insurance and increased out-of-pocket costs" and (2) requiring "some class members [with post-ratification spouse deaths] to pay a monthly premium and stating that it has the right to charge a monthly premium for all class members (though it is 'waiving it' for the time being for some)." (Docket No. 218 at 2.)

To be clear, even though the language of the relevant labor agreement states that benefits are "no cost," the *Kerns* class does not assert that they are entitled to absolutely free medical benefits; rather, they "object to paying any cost increases above those set forth in the 1998 GIP," which, they claim, are: an annual deductible ($300 per individual and $600 per family), an annual out-of-pocket maximum charge ($1,000 per individual and $2,000 per family), and co-

---

[20]As noted in a prior opinion, while the *Kerns* class consists only of "surviving spouses," the size of the *Kerns* class may grow in the future, as the living Caterpillar retirees who retired under the 1998 Plan pass on. *Kerns*, 499 F. Supp. 2d at 1023.

[21] In a footnote, providing little explanation, Caterpillar argues that, because the 1998 CLA was "superseded" by the 2004 CLA, the plaintiffs' claim here falls under the exclusive jurisdiction of the NLRB. (Docket No. 253 at 15-16.) This argument is facially without merit because the statutes under which the plaintiffs sue provide that the plaintiffs may sue if a contract under which they had rights was breached.

insurance that, effective January 1, 2006, requires them to pay 10 percent of in-network costs (rising to 20 percent in 2008) and a range from 10 percent to 50 percent of out-of-network costs depending on the service rendered. (Docket No. 241 at 16.) The plaintiffs also assert that Caterpillar has not reimbursed plaintiff Stewart for increased prescription drug co-payments that it imposed on her from January 1 to November 1, 2006. (Docket No. 240 at 9.)

For the same reasons as expressed in *Winnett*, the court finds that these additional charges, while undoubtedly imposing a financial burden on the class members, are "reasonable" and ancillary charges under *Reese.* As in *Reese,* while the plan documents say "no cost" or "no contributions," "no party to the case – the union, the employer, the retirees – viewed the benefits in this way." 574 F.3d at 324. That is, the *Kerns* plaintiffs concede that they are responsible for, at least, a $5/$15 (generic/brand) prescription drug co-payment and the assorted additional medical charges (including out-of-pocket costs) that come from seeing an out-of-network physician under the 1998 GIP, along with the costs of office visits. (Docket No. 250 at 17; Docket No. 240 at 4; Docket No. 253 at 15.) That is, aside from the imposition of premiums, the *Kerns* plaintiffs are not objecting to "costs," only "increased costs."

This Plan, like the plan in *Reese*, is subject to reasonable adjustments, as part of the give-and-take of labor negotiations. Therefore, as in *Winnett*, Caterpillar has not violated ERISA or the LMRA by instituting these additional charges. However, for the same reasons as in *Winnett*, premiums to maintain health insurance coverage constitute a "different animal" from increased charges once an individual is using the health care system. Caterpillar may not lawfully charge premiums to the *Kerns* class members, regardless of the date of the death of the retiree-spouse.

40

The surviving spouses who have been charged premiums because their spouses died after March 10, 2005 have been damaged and their rights under ERISA and the LMRA have been violated.

### C.    Third-Party Complaint

On May 1, 2008, in essentially identical opinions that ruled on the UAW's Motion to Dismiss in *Winnett* and *Kerns*, the court dismissed much of Caterpillar's third-party Complaint against the UAW and several local labor unions. *See Winnett*, 2008 WL 1943995; *Kerns*, 583 F. Supp.2d 885. Indeed, the court dismissed all but Caterpillar's claims (asserted under Counts III and IV of its third-party Complaint) that the UAW breached the 2004 labor agreements (Count III) and the LDSA (Count IV) by actively "encouraging and supporting" the *Winnett* and *Kerns* lawsuits. *See Kerns*, 583 F. Supp. 2d at 902-04. Discovery has shown that Caterpillar's remaining claims against the UAW are without merit and should be dismissed.

First, Count IV alleges that, by "actively sponsor[ing], fund[ing], encourag[ing], and support[ing] the *Kerns* lawsuit, and "actively encourag[ing] and support[ing]" the *Winnett* litigation, the UAW breached the LDSA, which, as noted above, prohibits the UAW from "funding or otherwise supporting, directly or indirectly, any litigation filed by itself, its members or third parties against Caterpillar . . . arising out of, or related to or connected with the Labor Dispute," that is, the period from November 1991 to March 1998. (*See Kerns*, 583 F. Supp. 2d at 902; *Winnett* Docket No. 448 at 22.) As discussed in the Motion to Dismiss opinion, the LDSA explicitly provides that claims arising after ratification of the 1998 CLA are not sufficiently connected to the Labor Dispute to implicate this provision. 583 F. Supp.2d at 903; *Kerns* Docket No. 94 Ex. 8 at 1.

41

At the Motion to Dismiss stage, the UAW argued that, because the plaintiffs' claims in the *Winnett* and *Kerns* litigation arose when the premiums and other costs were first directly assessed, the claims arose after ratification of the 1998 CLA. *Kerns*, 583 F. Supp.2d at 903. At that time, the court did not dismiss Count IV because Caterpillar had met its mild burden to state a claim upon which relief could be granted. *Id.* Now, however, the court has determined (repeatedly) that the plaintiffs' claims arose several years after ratification and, therefore, the provision of the LDSA under which Caterpillar sued cannot provide relief. Therefore, Count IV will be dismissed.

Count III is a breach of contract claim based upon the 2004 labor contracts. As discussed in the court's previous opinion, the 2004 labor contracts contain no explicit promise from the UAW "not to encourage or support any claims by Caterpillar retirees for vested benefits." *Id.* at 902. Yet, Caterpillar alleges that the UAW has breached the provision that prohibits the UAW from "engag[ing] or continu[ing] to engage in or in any manner sanction[ing] or encourag[ing] any strike, work stoppage, slowdown, or other interruption or impeding of work, or engag[ing] or continu[ing] to engage in any other *use of economic force* for the purpose of securing any modification, change, or termination of [the IPA or GIP], or for the purpose of securing the establishment of any new, different or additional plan for insurance or other benefits for death, sickness, accident, hospitalization or surgical or other medical services, or other welfare plans for the benefit of Employees or retired Employees, or the Dependents of either." (*Winnett* Docket No. 435 at 14-15.)(emphasis added).

Caterpillar also alleges that the UAW's conduct has breached the 2004 labor contracts

42

through "subversion." *Kerns*, 583 F. Supp.2d at 902. While, in its previous opinion, the court expressed some concerns about the viability of Caterpillar's Count III claims in the long run, the court found, that, "[v]iewing these allegations in the light most favorable to Caterpillar, these allegations are sufficient to withstand a Rule 12(b)(6) attack." *Id.*

Now, as to *Winnett*, the UAW argues that there is no factual basis for Caterpillar's claim that it "encouraged or supported" the *Winnett* litigation. (*Winnett* Docket No. 402 at 11-12.) That is, it is undisputed that the UAW is not funding the *Winnett* litigation, has not retained counsel for the *Winnett* plaintiffs and is not paying any fees or expenses associated with that case, and that, prior to the filing of the *Winnett* lawsuit, Michael Saggau of the UAW's general counsel's office spoke to counsel for the *Winnett* plaintiffs, advising them of "pitfalls" associated with this type of litigation. (*Id.* at 12.)

Moreover, the UAW argues, even if, prior to the *Winnett* filing, Mr. McClow visited some Caterpillar retirees to discuss a potential lawsuit, that conduct falls well short of "encouraging or supporting" the *Winnett* litigation. (*Id.* at 13.) Finally, while, after *Winnett* was filed, UAW representatives (1) submitted affidavits in support of the plaintiffs' position on issues such as the motion to transfer, (2) encouraged Mr. Finn to move his case to this District and (3) conducted discovery into issues such as whether Caterpillar had billed the VEBA for surviving spouse medical expenses, these facts only show that the UAW was "seeking to protect its own interests, particularly the UAW's interest in minimizing the time and expense of the lawsuits on the UAW." (*Id.* at 14.) That is, knowing that "many of the key witnesses and documents" in the case would come from the UAW, the UAW sought to have this litigation

43

conducted in a single, easily-assessable location, that is, Nashville, Tennessee. (*Id.*) And, on

the conducting investigation/VEBA issue, the UAW argues that Caterpillar, having sued the

UAW, can hardly complain when the UAW takes steps to discover the facts of the litigation in

an attempt to vigorously defend itself. (*Winnett* Docket No. 452 at 6.)

While there is no dispute that the UAW is supporting the *Kerns* litigation financially and

otherwise, the UAW argues that "the 2004 Labor Agreement does not preclude" the UAW's

sponsorship of the litigation. (*Kerns* Docket No. 211 at 12.) The UAW points out that there is

no "covenant not to sue" in the 2004 labor agreements between the UAW and Caterpillar and no

other explicit language that would prohibit the UAW from supporting this litigation. (*Id.* at 14.)

While there is a "no strike" provision in the 2004 IPA (quoted above), the UAW argues that

"notably absent from the list of specific conduct in which the UAW may not engage is a

prohibition on sponsoring litigation." (*Id.*)

Additionally, the UAW argues, Caterpillar's "subversion" argument must be rejected.

That is, while breach may, in certain circumstances, be inferred from actions that are

"inconsistent with" the existence of a contract, the UAW's actions here are not "inconsistent

with" the existence of the 2004 labor agreements, as the UAW is sponsoring the *Kerns* plaintiffs'

argument that they have a vested right to health benefits under a pre-2004 labor agreement. (*See

id.* at 19.) This is particularly so here, where "the UAW and Caterpillar have long resorted to

litigation to clarify their contractual rights" and to challenge each other's "interpretation or

execution of the parties' various agreements." (*Id.* at 17.)

In a consolidated response, Caterpillar notes (again) that the UAW is sponsoring the

44

*Kerns* lawsuit and re-hashes its evidence (the McClow meeting, the VEBA investigation, the motion to transfer affidavits, the discussion with Finn, etc.) in support of the argument that the UAW is "encouraging" the *Winnett* lawsuit. (*Winnett* Docket No. 437 at 4-9.) Next, Caterpillar argues that the UAW is "subverting" the 2004 labor agreement and breaching the implied covenant of good faith and fair dealing implied therein because it is "frustrat[ing] the purpose of the[] contract." (*Id.* at 9-13)(citing, *e.g. Safeco v. City of White House, Tenn.*, 36 F.3d 540, 548 (6th Cir. 1994); 23 WILLISTON ON CONTRACTS § 63:1 (refusal to recognize existence of a contract or to act consistently with the existence of a contract may be a breach).. Rather than a typical labor dispute between the parties over the meaning of a contract term, Caterpillar argues, the UAW is seeking to invalidate the terms of the 2004 agreement, which specify that retirees and their surviving spouses are to pay specific dollar amounts for medical care. (*Id.* at 11.)

As indicated by the lack of "on point" case law Caterpillar put forth in support of its subversion argument, this is simply not a situation in which a "breach by subversion or bad faith" argument can credibly be raised. The UAW is simply not acting inconsistently with the *existence and validity of the* 2004 labor agreement or that agreement's covenant of good faith and fair dealing by supporting the argument that the plaintiffs have rights that vested under an earlier agreement. *See generally Safeco*, 36 F.3d at 548. The UAW is not supporting a position that disclaims the existence of the 2004 agreement or a position that is flatly inconsistent with its terms; it is, rather, supporting a position that the plaintiffs are not bound by certain regulations in that agreement because of the language of an earlier agreement. Caterpillar's subversion argument, therefore, fails as a matter of law.

45

Next, Caterpillar argues that the UAW's conduct here is explicitly prohibited by the 2004 IPA language that prohibits the UAW from using "any other . . . economic force for the purpose of securing any modification, change or termination of this Agreement." (*Winnett* Docket No. 437 at 13.) While Caterpillar concedes that this language is contained in what is "essentially a no strike clause," through this language, "the provision goes beyond the typical no strike clause." (*Id.* at 14.) Absent from Caterpillar's briefing is any case law that has extended language of this type to prohibit the support and funding of litigation.

Caterpillar is attempting to stretch this provision well beyond its reasonable interpretation. The "other use of economic force" language is surrounded by specific examples of prohibited conduct – all of which fall into the category of "causing a labor disruption." That is, this catch-all provision appears to be a term of art that seeks to prohibit conduct that would disrupt Caterpillar's ability to produce its products in a timely manner. *See also Brown v. Pro Football*, 782 F. Supp. 125, 135 (D.D.C. 1991)("'economic force' . . . includes strikes, lockouts, pickets, and the hiring of replacement workers."). While Caterpillar makes a clever argument, there is no indication – either from the contract or the record – that a broad prohibition on the support of litigation was the parties' intent, and there certainly would be much clearer and more logical ways to convey the point.

Rather, as the UAW points out, litigation over the terms of a collective bargaining agreement is a fairly common and accepted practice between these parties, and to say that the parties would have intended, through such vague and ill-connected language, to prohibit the support of litigation surrounding the labor agreement strains credulity. (*Winnett* Docket No. 452

46

at 12-13.)  In sum, Caterpillar's argument that the "use of economic force" catch-all bars the UAW's conduct here fails as a matter of law.  Therefore, Caterpillar cannot point to a provision in the 2004 labor agreement that the UAW has breached through its conduct in either case.  With no viable arguments remaining, Caterpillar's third-party Complaint against the UAW will be dismissed.[22]

## **CONCLUSION**

All liability issues between the parties (other than the UAW's counterclaims against Caterpillar) are resolved by this opinion.

The *Winnett* plaintiffs are entitled to judgment as a matter of law on their remaining ERISA and LMRA claims as to the CLS subclass and the "surviving spouse" subclass, with potential damages having been incurred as to both of those subclasses due to Caterpillar's charging of premiums (but only premiums) to those subclasses as described above.  Caterpillar is entitled to summary judgment on the other remaining claims in *Winnett*, and the court, through the attached Order, will amend the preliminary injunction entered earlier to reflect this.

---

[22]On March 18, 2009, in both the *Winnett* and *Kerns* litigation, Caterpillar filed a Motion to Re-Open Discovery for the Limited Purpose of Deposing Roger J. McClow, or in the Alternative, to Strike the Declaration of Roger J. McClow.  (*Winnett* Docket No. 458; *Kerns* Docket No. 259.)  The premise of this motion is that, throughout this litigation, McClow has been shielded from all manner of discovery by counsel's invocation of attorney-client privilege, yet McClow submitted an affidavit in summary judgment briefing refuting Caterpillar's assertion that he was working for the UAW when he met with the retirees in 2005.  (*Kerns* Docket No. 260 at 1.)  Caterpillar asks the court to either (1) compel Mr. McClow to appear for deposition to answer questions about the matter in his affidavit or (2) disregard and strike the affidavit.  (*Id.* at 2.)  As should be clear from the discussion herein (including the fact that the court has not relied on McClow's affidavit in reaching its conclusions), Caterpillar's claims fail regardless of the challenged statements in McClow's affidavit, and, therefore, Caterpillar's motion will be denied.

47

The *Kerns* plaintiffs are entitled to judgment as a matter of law on their remaining ERISA and LMRA claims, as the court finds that it was and would be improper for Caterpillar to charge premiums (but only premiums) to this class as described above, and potential damages have been incurred by this class to the extent that Caterpillar has charged premiums to certain members of this class, that is, those whose spouses died after the ratification of the 2004 Labor Agreement. Caterpillar is entitled to summary judgment on the other aspects of the plaintiffs' claims in *Kerns*.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge