UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JUDITH K. KERNS, et al.,                    )
     Plaintiffs,                          )
                                            )
v.                                          )          Case No. 3: 06-CV-1113
                                            )          Judge Trauger
CATERPILLAR INC.,                           )
     Defendant/Third-Party Plaintiff,     )
                                            )
v.                                          )
                                            )
INTERNATIONAL UNION, UAW, et al.,           )
     Third-Party Defendants               )

## MEMORANDUM OPINION

Pending before the court is a Motion to Reconsider filed by Caterpillar, Inc. ("Caterpillar") (Docket No. 451), accompanied by a Memorandum in support (Docket No. 452). The plaintiffs have filed a response in opposition (Docket No. 459), and Caterpillar has filed a Reply (Docket No. 466). The plaintiffs have also filed a Motion to Reconsider (Docket No. 464) and a Memorandum in support (Docket No. 465). Caterpillar has filed a response in opposition (Docket No. 467,) and the plaintiffs have filed a Reply (Docket No. 470). For the following reasons, the court will deny both motions.

## I.    Background

This is a class-action lawsuit brought on behalf of surviving spouses of former employees of Caterpillar who retired on or after March 16, 1998, and before January 10, 2005. Because the court has recounted the factual and procedural history of this case numerous times, familiarity

with the facts will be assumed.[1] The plaintiffs filed this action in 2006, seeking relief under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and under § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. The plaintiffs allege that Caterpillar breached its contractual obligation to provide lifetime health benefits to surviving spouses of Caterpillar retirees at no cost.

On June 27, 2007, the court denied Caterpillar's motion to dismiss, rejecting its arguments that the court lacked subject matter jurisdiction over the plaintiffs' LMRA and ERISA claims, that the plaintiffs could not maintain an action on behalf of a hypothetical group of "future" surviving spouses that could not be readily identified, and that the claims of current surviving spouses were moot. (Docket No. 77, at 3.) The court also found that, because the parties had presented plausible, but competing, interpretations of the contractual language of the retiree benefits plan with respect to the alleged intention to confer lifetime health benefits to surviving spouses, extrinsic evidence could be introduced to resolve the ambiguity. (*Id.*, at 28.) However, because little discovery had been completed at that time, the court found that it was too early to determine whether, as a matter of law, the plaintiffs' benefits had vested and, if so, when they vested. (*Id.*, at 28–29.)

On March 26, 2010, the court ruled on the plaintiffs' and Caterpillar's cross motions for summary judgment and granted and denied each in part. (Docket No. 262.) The portion of the collective bargaining agreement ("CBA") between Caterpillar and the UAW that addresses the

---

[1]This case and *Winnett v. Caterpillar*, Case No. 3:06-0235, are related but not consolidated cases. By prior order dated March 26, 2010, this court granted the International Union, UAW's motions to dismiss Caterpillar's Third-Party Complaint against it in both *Kerns* and *Winnett*. (Docket No. 263.) Subsequently, through a series of decisions from this court and the Sixth Circuit, the court dismissed the *Winnett* plaintiffs' claims and closed that case. (Docket Nos. 326, 327.

retiree health benefits for the *Kerns* plaintiffs is the 1998 Group Insurance Plan ("GIP"). A subsection of the 1998 GIP is the Insurance Plan Agreement ("IPA"). (Docket No. 222-9 at 1–3.) Contrary to the finding at the motion to dismiss stage that the contract language was ambiguous, in the summary judgment memorandum opinion, the court found that the language in Section 5.15 of the 1998 GIP (Docket No. 222-9, at 61) that provided that health care benefits "will be continued following the death of a retired Employee for the remainder of the surviving spouse's life without cost" was "sufficient to unambiguously vest in the surviving spouse a right to lifetime 'no cost' health benefits." (*Id*., at 35–36.) The court further found that, although it was not necessary to consider extrinsic evidence because Section 5.15 of the 1998 GIP was unambiguous, the extrinsic evidence before the court "plainly supports the plaintiffs' position." (*Id.*, at 36–37 n.18.)

Having concluded that lifetime benefits had vested for the surviving spouses and that Caterpillar had no viable affirmative defenses, the court turned to an analysis pursuant to *Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009), which "stands for the proposition that, even if the retiree has a vested right to lifetime health benefits from his employer, unless there is some exceptional language that dictates that benefits can 'never vary,' that retiree is entitled to 'lifetime benefits subject to reasonable changes.'" (Docket No. 262, at 27 (quoting *Reese*, 574 F.3d at 326).) The court concluded that, pursuant to *Reese*, the additional deductibles, co-insurance, and increased out-of-pocket costs were permissible, but held that Caterpillar's imposition of monthly premiums violated ERISA and the LMRA. (*Id*., at 39–41.) Accordingly, the court entered judgment for the plaintiffs on their claims related to Caterpillar's imposition of premiums. The summary judgment order resolved all liability issues between the plaintiffs and Caterpillar. (*Id*., at 47–48.)

Still pending at the time of the court's March 26, 2010 summary judgment ruling was Caterpillar's October 16, 2008 appeal of the court's preliminary injunction order for a subclass of the *Winnett* plaintiffs. On June 22, 2010, the Sixth Circuit reversed this court's *Winnett* preliminary injunction order, finding that the claims of the subclass were barred by the statute of limitations. (*Winnett* Docket No. 470.)

After the Sixth Circuit issued its ruling, Caterpillar filed motions to reconsider in both *Winnett* and *Kerns*. (*Winnett* Docket No. 475; *Kerns* Docket No. 266.) In the *Kerns* motion, Caterpillar argued that, by the logic of the Sixth Circuit's decision in *Winnett*, the *Kerns* plaintiffs' claims were also barred by the statute of limitations. (Docket No. 280, at 15.) On January 12, 2011, this court rejected Caterpillar's argument, based on factual differences between the claims of the plaintiffs in *Winnett* and *Kerns*. In particular, the *Winnett* plaintiffs sought to maintain the level of benefits under the 1988 GIP, not the 1998 GIP, which led to a different determination of when the *Kerns* plaintiffs' claims accrued. (*Id.*, at 16–17.)

The court also rejected Caterpillar's argument that the Sixth Circuit's intervening decision in *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 428 (6th Cir. 2010), justified a reconsideration of the court's ruling that the plaintiffs have a vested right to lifetime, premium-free health benefits under the 1998 GIP. (Docket No. 280, at 18 n.6.) The court concluded that, unlike in *Wood*—which found that, when various provisions of the agreements were read together, the only coherent interpretation was that plaintiffs are entitled to lifetime, capped health care benefits—this case has "no clearly conflicting language for the court to blend together, and, therefore, there is no basis for the court to reconsider its earlier ruling." *Id.* Accordingly, the court granted Caterpillar's motion to reconsider in *Winnett* based on the statute of limitations, but denied its motion in *Kerns*. (Docket No. 280.)

On August 20, 2014, the court ruled on Caterpillar's motion for summary judgment on damages issues, in which Caterpillar argued that it was not liable for the out-of-pocket expenses incurred by surviving spouses who canceled their Caterpillar insurance. (Docket No. 408.) The court denied the portion of Caterpillar's motion that the court construed as a motion to strike certain damages, holding that, under Section 301 of the LMRA, Caterpillar is liable for the cost of replacement insurance and out-of-pocket expenses incurred by plaintiffs who obtained alternative insurance or became uninsured because Caterpillar breached the collective bargaining agreement. (*Id.*) The court granted Caterpillar's motion and entered judgment in its favor on the claims of four class members who had produced no admissible evidence demonstrating their damages or who had produced no admissible evidence that they terminated their Caterpillar insurance because of the imposition of premiums. (*Id.*) As to eight other class members who were the subjects of Caterpillar's motion for summary judgment, the court held the motion in abeyance and requested that those plaintiffs file a cross motion for summary judgment. (*Id.*) On January 16, 2015, the court granted the motion for summary judgment filed by the eight plaintiffs, entered judgment in their favor as to damages in the form of out-of-pocket expenses, and ordered Caterpillar to re-enroll these plaintiffs in its insurance plan without premiums. (Docket No. 432.)

## II. Legal Standard

While the Federal Rules of Civil Procedure fail to explicitly address motions to reconsider interlocutory orders, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)); *accord In re Life*

*Investors Ins. Co. of Am.*, 589 F.3d 319, 326 n. 6 (6th Cir. 2009). Thus, district courts may "afford such relief from interlocutory orders as justice requires." *Rodriguez*, 89 F. App'x at 959 (internal quotations marks and brackets omitted). "Courts traditionally will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error of law or prevent manifest injustice." *Louisville/Jefferson Cnty., Metro. Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (citing *Rodriguez*, 89 F. App'x at 959). This standard "vests significant discretion in district courts." *Rodriguez*, 89 F. App'x at 959 n. 7.

## III.  Caterpillar's Motion to Reconsider

Caterpillar moves the court to reconsider its prior rulings on the basis that, in *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), the Supreme Court abrogated *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), upon which this court relied in its previous rulings. The plaintiffs counter that *Tackett* does not require a change in this court's previous rulings because this case involves express, unambiguous contract language that demonstrates the bargaining parties' intent to continue health care benefits for the lifetimes of the surviving spouses beyond the expiration of the 1998 GIP and that there is much extrinsic record evidence confirming that intent. They further argue that the court in this case did not apply the *Yard-Man* inferences that were overruled by *Tackett*.

### A.  The Supreme Court's *Tackett* Decision

In *Tackett*, the Supreme Court held that "*Yard–Man* violates ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements," "distorts the attempt 'to ascertain the intention of the parties,'" and "has no basis in

ordinary principles of contract law." *Tackett*, 135 S. Ct. at 935 (quoting 11 R. Lord, Williston on Contracts § 30:2, 18 (4th ed. 2012)). Although the Supreme Court quoted with approval *Yard-Man*'s statement that "traditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation," *id*. at 936, it rejected numerous other aspects of the *Yard-Man* decision, including: (1) the conclusion that, "'when . . . parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree,'" *id*. at 935 (quoting *Yard-Man*, 716 F.2d at 1482); (2) the inference that "retiree health care benefits are not subjects of mandatory collective bargaining," which, the Supreme Court found, "rest[s] on a shaky factual foundation," given that parties "can and do voluntarily agree to make retiree benefits a subject of mandatory collective bargaining," *id*. at 936; (3) the reliance on the premise that "retiree benefits are a form of deferred compensation," when that characterization is contrary to ERISA, *id*; (4) the "refusal[al] to apply general durational clauses to provisions governing retiree benefits," *id.*; (5) the "misappl[ication] of traditional principles of contract law, including the illusory promises doctrine," *id.*; (6) the "fail[ure] even to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises," *id.* (citing 3 A. Corbin, Corbin on Contracts § 553, p. 216 (1960)); and (7) the "fail[ure] to consider the traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *Id.* at 937 (quoting *Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 207 (1991)). As to the last point, the Court held:

> That principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees. Indeed, we have already recognized that "a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration." [*Litton*, 501 at 207]. But when

a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.

*Id.* at 937.

Justice Ginsburg's concurrence states as follows:

Under the "cardinal principle" of contract interpretation, "the intention of the parties, to be gathered from the whole instrument, must prevail." 11 R. Lord, Williston on Contracts § 30:2, p. 27 (4th ed. 2012) (Williston). To determine what the contracting parties intended, a court must examine the entire agreement in light of relevant industry-specific "customs, practices, usages, and terminology." *Id.*, § 30:4, at 55–58. When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further. *Id.*, § 30:6, at 98–104. But when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties. *Id.*, § 30:7, at 116–124.

*Id.* at 937–38. The concurrence also clarifies that, although lower courts must not utilize *Yard-Man*'s "thumb on the scale in favor of vested retiree benefits," contractual provisions such as the ones in the *Tackett* case — providing that retirees "will receive" health-care benefits if they are "receiving a monthly pension" or that a surviving spouse will "continue to receive [the retiree's health-care] benefits ... until death or remarriage" — are "relevant to this examination." *Id.* at 938 (citations omitted). Finally, the concurrence advises the following:

[N]o rule requires "clear and express" language in order to show that parties intended health-care benefits to vest. "[C]onstraints upon the employer after the expiration date of a collective-bargaining agreement," we have observed, may be derived from the agreement's "explicit terms," but they "may arise as well from ... implied terms of the expired agreement." *Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 203, 207 (1991).

*Id.*

## B. The Court's Ruling on Caterpillar's Motion to Dismiss

In ruling on Caterpillar's motion to dismiss, this court explained:

Retiree health benefits are addressed in . . . the IPA and the GIP. The IPA, like the CBA, was effective by its terms until April 1, 2004. The IPA expressly states: "Termination of this Agreement shall not have the effect of automatically

terminating the Plan." "The Plan" refers to the GIP. This language indicates that, even though the Agreement (the CBA) expires by its terms on April 1, 2004, the GIP and the concomitant benefits provided thereby need not also expire.

Section 5.1 on page 38 of the GIP, under Section V entitled "Medical Expense Benefits," provides:

> A benefit shall be provided in accordance with this Section only for an Employee, while coverage for such benefit is in effect with respect to such Employee. **Benefits in accordance with this Section will be provided to such Employee, retired Employee, and Dependents thereof for the duration of any Agreement to which this Plan is a part.**

(Ex. 7 to Docket No. 50) (emphasis added). Caterpillar reads this language to say that health benefits (including retiree health benefits) lasted only as long as the labor contracts themselves. (Docket No. 56 at 5–6). This type of specific durational language, urges Caterpillar, is fundamentally inconsistent with the plaintiffs' claim of vesting. (*Id*. at 6). Conversely, the plaintiffs read this language to require that Caterpillar provide benefits to employees, retirees, and dependents at least for the duration of the labor contracts. Thus, say plaintiffs, this language does not defeat their claim of vesting; if anything, it renders the language of the governing document ambiguous and opens up the court's inquiry to extrinsic evidence.

(Docket No. 77, at 24–25 (Motion to Dismiss Memorandum Opinion).)

Finding ambiguity in these provisions, the court concluded that extrinsic evidence of the parties' intentions could be introduced to resolve the ambiguity. (*Id*., at 25.) Although the court did discuss several *Yard-Man* inferences that pointed to an intent to vest— namely, language in the agreements that linked medical benefits to pension eligibility, the fact that retirement benefits are a form of delayed compensation, and the inference that retiree benefits continue as long as the requisite "status" of being a retiree is maintained— the court found that it was premature to consider extrinsic evidence because little discovery had been conducted at that point. (*Id*., at 25–29.) Accordingly, the court denied Caterpillar's motion to dismiss.

### C. The Court's Ruling on Caterpillar's Motion for Summary Judgment

Although this court discussed the *Yard-Man* inferences in its motion to dismiss ruling, its summary judgment ruling does not rely on *Yard-Man* inferences or even cite the case. The court set forth its analytical framework as follows:

> [I]n resolving a claim for vested health care benefits stemming from a collective bargaining agreement, the court uses basic canons of contractual interpretation, looking to the "explicit language" of the agreement for "clear manifestations of intent" to vest. That is, based upon the entire contract, the court examines whether the language of the contract indicates that the parties intended to make benefits under the contract unalterable by subsequent labor agreements.

(*Id.*, at 26 (quoting *Reese*, 574 F.3d at 321).)

For the sake of judicial economy, the court issued a single memorandum opinion on the cross motions for summary judgment in both *Winnett* and *Kerns*. In the portion of the court's summary judgment ruling that addressed the claims of the *Winnett* surviving spouse subclass (whose claims were governed by an earlier version of the GIP that had identical language in Section 5.15 as that contained in the 1998 GIP), the court concluded:

> Simply put, the 1992 unilateral implementation means what it says. That is, while the language is in force, once a retired employee dies, the surviving spouse is entitled to "continued" coverage "without cost." This is precisely the type of "explicit language" and "clear manifestation of intent" that must be found before the court can conclude, as a matter of law, that the parties intended benefits to vest under the agreement. *Yolton v. El Paso Tenn. Pipeline*, 435 F.3d 571, 578–79 (6th Cir. 2006). Caterpillar, for all of its efforts to find a way around the clear language, cannot point to a single provision in the 1992 unilateral implementation that negates the plain language discussed above. The language here is plainly unambiguous and indicates that the 1992 unilateral implementation provided surviving spouses with vested no-cost medical benefits.

(*Id.*, at 31–32.)

In the portion of the summary judgment ruling that addressed the *Kerns* plaintiffs' claims, the court similarly found that the identical language in Section 5.15 of the 1998

GIP—providing that health care benefits "will be continued following the death of a retired Employee for the remainder of the surviving spouse's life without cost"—was "sufficient to unambiguously vest in the surviving spouse a right to lifetime "no cost" health benefits." (Docket No. 262, at 36.) Responding to Caterpillar's argument that this language was accidentally left in the 1998 GIP and was not consistent with the agreement reached in the bargaining process, the court held as follows:

> While it is not necessary to consider extrinsic evidence here, the extrinsic evidence submitted plainly supports the plaintiffs' position that there was no mistake. *See Cole v. ArvinMeritor*, 549 F.3d at 1064, 1075 (6th Cir. 2008) (where the contract language is unambiguous, the court is to apply that language without recourse to extrinsic evidence.) As discussed in previous opinions, the *Kerns* plaintiffs have submitted letters from Caterpillar to class members upon the death of their spouse in which Caterpillar represents that health care coverage will continue at "no cost," and the plaintiffs have also submitted evidence that appears to show that Caterpillar did not charge the VEBA [Voluntary Employee Benefits Association] for surviving spouse premiums. (See Docket Nos. 223 Ex. 10; Docket No. 218, at 13.) In response, Caterpillar largely relies on self-serving deposition testimony from its own representatives, while conceding that the VEBA was not charged for surviving spouses and that it sent the letters discussed above to surviving spouses. (Docket No. 246, at 7–13; Docket No. 219, at 6–7.)

(Docket No. 262, at 36–17 n. 18.)

### D. The Impact of *Tackett* on the Court's Previous Rulings

The court's summary judgment ruling does not rely on, or even mention, the *Yard-Man* presumptions in reaching the conclusion that the health care benefits at issue here have vested. The court has reviewed its prior decisions in this matter, mindful of the traditional principles "that courts should not construe ambiguous writings to create lifetime promises" and that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement" that the Supreme Court reminded courts to consider in *Tackett*, 135 S. Ct. at 936–37 (internal citation omitted). Yet, utilizing basic canons of contractual interpretation to "ascertain

the intention of the parties," without implementing *Yard-Man* presumptions or otherwise "placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements," *id.* at 935 (internal citations omitted), the court finds, again, that this collective agreement does, in fact, evidence a clear intention by the parties to vest lifetime benefits in this group of surviving spouses, by providing, "in explicit terms that certain benefits continue after the agreement's expiration." *Id.* at 937 (quoting *Litton*, 501 U.S. at 207).

Caterpillar argues that *Tackett* compels the court to reverse its finding that the surviving spouses have a vested right to lifetime, premium-free benefits because, "[v]iewed as a whole, the relevant 1998 labor contract language shows that at most, Plaintiffs' benefits 'vested' for no more than the duration of the 1998 labor contract, and subject to the financial caps imposed in that contract for each 'covered individual." (Docket No. 452, at 12.) To the contrary, numerous contractual provisions indicate the intention of the parties to vest benefits. For example, after a long list of specific amendments to the GIP, which the parties had negotiated, Section 3 of the 1998 IPA provided the following: "The provisions of the Group Insurance Plan as in effect on September 30, 1991 *shall continue in effect until amended pursuant to the foregoing and thereafter to the extent not amended pursuant to the foregoing."* (Docket No. 222-9, at 10 (emphasis added).) Section 9(a) of the 1998 GIP provides that "Termination of [the CBA] shall not have the effect of automatically terminating the Plan." (Docket No. 222-9, at 13.) Section 5.15 of the 1998 GIP provides: "Dependents' Coverage will be continued following the death of a retired Employee for the remainder of his surviving spouse's life without cost." (Docket No. 222-9, at 61.) Section 6.2(c) of the 1998 GIP provides: "Such Dependents' Coverage for any such surviving spouse . . . will continue . . . for the remainder of her life without cost." (Docket No. 222-10, at 41.)

Thus, the court reiterates here its conclusion that the language in the 1998 GIP was "sufficient to unambiguously vest in the surviving spouse a right to lifetime "no cost" health benefits." (Docket No. 262, at 36.) Indeed, although Justice Ginsburg's concurrence in *Tackett* makes clear that "no rule requires 'clear and express' language in order to show that parties intended health-care benefits to vest," *Tackett*, 135 S. Ct. at 938, the agreement between the parties in this case does, in fact, contain clear and express language of the parties' intention that this group of surviving spouses has vested health care benefits.

Furthermore, even if the contract language were ambiguous, the court has already concluded that the extrinsic evidence presented to the court "plainly supports the plaintiffs' position" that the benefits had vested. (Docket No. 262, at 36–17 n. 18.) The court has previously concluded that the letters Caterpillar undisputedly sent to the class members upon the death of their spouse, in which Caterpillar represented that health care coverage would continue at "no cost," supports a finding of vesting. (*Id.; see also* Docket No. 243, at 18–22.) Similarly, the court has also held that Caterpillar's practice of not charging the VEBA trust fund for surviving spouse premiums supports a finding of vesting. (*Id.*) The VEBA trust fund was created from contributions by the UAW and Caterpillar upon resolving the 1998 labor dispute to cover the retirees' share of the "above the cap" costs until the fund ran out of money. Consistent with its purpose, Caterpillar charged the VEBA for health coverage for retirees and their dependents while the retiree was still living. However, with very few exceptions, upon the death of the retiree, Caterpillar concedes that it no longer charged the VEBA for the cost of the coverage of the surviving spouse. (Docket No. 226, at 7–8; *see also*, Docket No. 243, at 27 (¶65), at 25–30 (¶¶ 60–73), at 15–16 (¶¶ 36–37).)

This previously cited extrinsic evidence also supports the court's rejection of Caterpillar's argument that the language regarding financial caps for each "covered individual" applied to surviving spouses, as opposed to retirees. (*See* Docket No. 280, at 11 n. 3 (reiterating the court's previous finding in favor of the surviving spouses subclass in *Winnett* on this issue).) Caterpillar's practice of not charging VEBA for surviving spouses' above-the-cap expenses is strong evidence that the parties intended the newly-imposed premium cap to apply to retirees, not to surviving spouses, and that the parties did, in fact, intend for surviving spouses to have lifetime, no cost coverage, as stated in the 1998 GIP.

Indeed, there is a plethora of additional extrinsic evidence in this case supporting a finding that the parties intended to vest in the surviving spouses a right to lifetime, no cost, health benefits, including *inter alia*:

- The bargaining history between the parties shows that the language in Section 5.15 appears, verbatim, in the 1988 GIP (Docket No. 50-19, at 19), the unilateral 1992 implementation (Docket No. 50-13, at 20), and the 1998 GIP (Docket No. 22-9, at 61). As the court noted in its summary judgment ruling, "[a]fter considerable negotiations on the issue, the 2004 labor contract removed the 'without cost for life' language pertaining to surviving spouse medical benefits that, in form and/or substance, had been in every previous labor agreement discussed herein." (Docket No. 262, at 10.) The removal of the language in the 2004 labor contract has no effect on the *Kerns* plaintiffs.

- The November 1999 summary plan documents stated, "If you die following your retirement, your surviving spouse will have coverage continued for his or her lifetime without cost." (Docket No. 222-13, at 54; *see also* Docket No. 223-1, at 58 ("If you die while eligible to retire or following your retirement, your surviving spouse will have coverage continued for his or her lifetime without cost."))

- Jerry Brust, Caterpillar's Director of Corporate Labor Relations at the time, testified during the *Winnett* preliminary injunction hearing. Again, the *Winnett* class members retired under an earlier version of the GIP that contained identical language in Section 5.15 as the 1998 GIP under which the *Kerns* class members retired. Thus, the court's conclusion about Mr. Brust's testimony in *Winnett* supports the conclusion the court has reached as to vesting in the *Kerns* case as well:

  > The testimony of Caterpillar's then Director of Corporate Labor Relations supports vesting. In describing why Caterpillar announced potential changes in 1991, Brust claimed that "we wanted to give employees an opportunity—if they were contemplating retiring in the near future ... to make the decision whether they were going to in effect, cash in their chips and push them back from the table prior to January of '92 and retire knowing that they had locked in at that point." (Tr. 373). Brust's use of the phrase "locked in" suggests that Caterpillar knew these benefits could not be taken away.

  *Winnett v. Caterpillar, Inc.*, 579 F. Supp. 2d 1008, 1032 (M.D. Tenn. 2008) *rev'd*, 609 F.3d 404 (6th Cir. 2010). The Sixth Circuit's reversal of the court's preliminary injunction ruling was based on legal issues not relevant to the court's conclusion about Mr. Brust's testimony.

- The plaintiffs have produced evidence of a large number of letters and forms on which Caterpillar made written representations of its intention to provide healthcare benefits for life, without cost, to surviving spouses, the authenticity and accuracy of which Caterpillar does not dispute. For example, the plaintiffs have produced fourteen letters sent from Caterpillar to surviving spouses between September 1999 and 2002, shortly after the retiree passed away, stating that the spouse would have healthcare coverage for his or her lifetime. Some letters specifically said "at no cost." (Docket No. 243 at 18–23 (¶¶ 45–53) (quoting nine such letters); Docket No. 223-4 (list of 14 Survivors Lifetime Letters).)

- After Caterpillar sent a letter dated September 4, 2003 announcing imposition of premiums, Caterpillar received written and oral complaints from surviving spouses that

the imposition of premiums was inconsistent with the promises Caterpillar had made. (Docket No. 243, at 31–32 (¶77).)

- The plaintiffs have produced letters that surviving spouses sent to Caterpillar after receiving a letter from Caterpillar dated October 10, 2005 (Docket No. 224-4), indicating its intention to begin imposing premiums. In each letter, the surviving spouses complained that this was inconsistent with promises Caterpillar had made to them or requested that Caterpillar investigate the matter. (Docket No. 243 at 32–34 (¶¶ 78–84).)

- Caterpillar sent three such surviving spouses letters dated in March 2006, confirming that they were entitled to lifetime, no cost coverage and attaching documentation of their right to such coverage. (Docket Nos. 234-7, 234-8, 234-9 (three surviving spouses' letters of complaint and Caterpillar's letters in response thereto).)

- Soon after Caterpillar sent these letters to the surviving spouses who complained, it sent letters to other surviving spouses indicating that, although there would be a delay in the collection of premiums, Caterpillar would begin charging premiums on April 1, 2006. (Docket No. 243, at 41 (¶108).)

- On April 13, 2006, the *Kerns* plaintiffs filed their Complaint in this matter. Plaintiffs have produced five letters sent by Caterpillar to *Kerns* surviving spouses, dated April 17, 2006, stating that Caterpillar had "elected to waive your health care premiums." (Docket No. 243, at 41 (¶111).)

- The plaintiffs also have presented evidence that, in 67 out of 96 benefits files Caterpillar provided for *Kerns* surviving spouses, there is a document prepared by Caterpillar and signed by the surviving spouse, usually shortly after her spouse died, called "Medical Expense Survivor's Coverage." Sixty-two of these forms indicated that "this survivor is eligible [for] retired coverage until lifetime" (or, in a few, until "death"). Sixty-three of the forms indicated that such coverage would be "free," at "no cost," "0"," or "none." (Docket No. 243, at 23–24 (¶55); 223-3 (list of 67 Survivors Medical Expense Survivor Coverage Forms).)

- Plaintiffs have provided evidence that five surviving spouses' files included a document titled "Survivor Insurance Information Cards" that indicate that there would be no cost to the surviving spouse for health coverage. (*See, e.g.*, Docket No. 243, at 24–25 (Caterpillar's Resp. to Pl.'s SUMF conceding the accuracy of the referenced forms).)

- Section 6.2(c) of the 1998 GIP ties pension eligibility to medical benefits. Although *Tackett* held that courts cannot presume vesting from this type of provision, Justice Ginsburg's concurrence clarifies that such tying language is "relevant" to the question of whether benefits have vested.

In sum, the court reiterates its previous conclusion that the various provisions of the contracts at issue in this case, when read together, demonstrate unambiguously the parties' intention for the surviving spouses to have lifetime "no cost" health benefits. In the alternative, if the provisions cited by Caterpillar create ambiguity as to the parties' intentions, the extrinsic evidence before the court overwhelmingly supports the court's conclusion. Because the court finds nothing in the Supreme Court's *Tackett* decision that changes its previous rulings in this matter,[2] Caterpillar's second motion to reconsider will be denied.

## IV. The Plaintiffs' Motion to Reconsider

The plaintiffs argue that the court's conclusion in its March 26, 2010 summary judgment ruling that, although Caterpillar's imposition of monthly premiums violated ERISA and the LMRA, its imposition of additional deductibles, co-insurance, and increased out-of-pocket costs were lawful pursuant to *Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009) (Docket No. 262,

---

[2]The clear contractual language and overwhelming evidence supporting the court's decision in this case distinguish it from *Reese v. CNH Indus. N.V.*, No. CV 04-CV-70592, 2015 WL 5679827 (E.D. Mich. Sept. 28, 2015), in which the district court reconsidered and reversed its finding of vesting in light of *Tackett*. Unlike this case, in *Reese*, the district court found that, after setting aside the *Yard-Man* presumptions, "[t]he remainder of the reasons underlying the Court's prior conclusion that Plaintiffs are entitled to lifetime healthcare benefits are either not sufficient on their own to support that conclusion or are no longer viable reasons under *Tackett*." *Id.* at *9.

at 39–41), should be reconsidered based on an intervening change of controlling law and to prevent a manifest injustice. In its summary judgment ruling, the court held that *Reese* "stands for the proposition that, even if the retiree has a vested right to lifetime health benefits from his employer, unless there is some exceptional language that dictates that benefits can 'never vary,' that retiree is entitled to 'lifetime benefits subject to reasonable changes.'" (Docket No. 262, at 27 (quoting *Reese*, 574 F.3d at 326).)

The plaintiffs argue that *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Kelsey-Hayes Co.*, 750 F.3d 546, 554 (6th Cir. 2014) *reh'g granted and opinion vacated*, 795 F.3d 525 (6th Cir. 2015), "corrected some common 'misapprehensions' about the *Reese* 'reasonable changes' holding, and clarified and severely limited *Reese* to its particular facts." (Docket No. 465, at 9.) The plaintiffs request that the court reconsider its summary judgment ruling and find that the *Kerns* class members are entitled to "receive the benefits set forth at the levels in the 1998 GIP for the remainder of their lives without premiums and without imposing the new deductibles, new co-insurance or other new costs." (*Id.*, at 10.)

The first problem with the plaintiffs' motion is that the Sixth Circuit has vacated the *Kelsey-Hayes* opinion on the basis of *Tackett* and, thus, the case has no precedential value. The plaintiffs counter that *Kelsey-Hayes* was vacated on grounds independent of *Reese*, which leads to the second problem with the plaintiffs' motion—*Kelsey-Hayes* does not represent a change in controlling law. *Kelsey-Hayes* is not in conflict with *Reese* or this court's application of *Reese*. The "misapprehension" *Kelsey-Hayes* was correcting was that of the *Kelsey-Hayes* defendants, not *Reese* or courts applying *Reese*. In rejecting the argument of the *Kelsey-Hayes* defendants, the Sixth Circuit explained as follows:

Underpinning many of defendants' arguments on appeal is a characterization of the *Reese* cases as a major sea-change in Sixth Circuit retiree benefits case law. . . . Specifically, defendants characterize *Reese's* conclusion that CNH could unilaterally alter the retirees' health care benefits to mean that all CBAs in the Sixth Circuit are always unilaterally alterable, regardless of a CBA's specific language. . . . We disagree with defendants and reject their interpretation of the *Reese* cases. Contrary to defendants' characterization, the *Reese* decisions are not a "significant change" in Sixth Circuit case law, but are entirely consistent with other Sixth Circuit retiree benefits cases insofar as the *Reese* courts simply examined the language of the CBA and the parties' conduct in reaching their conclusions. . . . In sum, the *Reese* courts concluded that there, the scope of the vested right to health care could be unilaterally altered because that is what the evidence indicated the parties intended in that case, not because all vested health care rights in all CBAs are subject to unilateral alteration as a matter of law.

*Kelsey-Hayes*, 750 F.3d at 554 (citations omitted).

The plaintiffs' real argument seems to be that the court misapplied *Reese* by interpreting it to mean that "all CBAs in the Sixth Circuit are always unilaterally alterable, regardless of a CBA's specific language," as the *Kelsey-Hayes* defendants interpreted it. *Id*. But this court did not assume that the 1998 GIP was unilaterally alterable as a matter of law. To the contrary, the court clearly considered the specific facts of the agreements between these particular parties:

For the same reasons as expressed in *Winnett*, the court finds that these additional charges, while undoubtedly imposing a financial burden on the class members, are "reasonable" and ancillary charges under *Reese*. As in *Reese*, while the plan documents say "no cost" or "no contributions," "no party to the case—the union, the employer, the retirees—viewed the benefits in this way." 574 F.3d at 324. That is, the *Kerns* plaintiffs concede that they are responsible for, at least, a $5/$15 (generic/brand) prescription drug co-payment and the assorted additional medical charges (including out-of-pocket costs) that come from seeing an out-of-network physician under the 1998 GIP, along with the costs of office visits. (Docket No. 250 at 17; Docket No. 240 at 4; Docket No. 253 at 15.) That is, aside from the imposition of premiums, the *Kerns* plaintiffs are not objecting to "costs," only "increased costs." This Plan, like the plan in Reese, is subject to reasonable adjustments, as part of the give-and-take of labor negotiations. Therefore, as in *Winnett*, Caterpillar has not violated ERISA or the LMRA by instituting these additional charges.

(Docket No. 262, at 40.)

The court also rejects the plaintiffs' argument that *Tackett* is inconsistent with this court's conclusion that Caterpillar's imposition of costs (other than premiums) were lawful. (Docket No. 465 at 18–19.) The plaintiffs quote the following from *Tackett*: "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*, 135 S. Ct. at 933 (citation omitted). The plaintiffs argue that, because the "for the remainder of his surviving spouse's life without cost" language in the 1998 GIP is unambiguous, under *Tackett*, the court must interpret the meaning of the contract in accordance with those express terms. But as Justice Ginsberg's concurrence in *Tackett* reiterates, "[u]nder the cardinal principle of contract interpretation, the intention of the parties, to be gathered from the *whole instrument*, must prevail." *Id.* (internal quotation marks and citation omitted). The language the plaintiffs focus on in Section 5.15 of the 1998 GIP must be read together with the provisions in that same document that set forth out-of-pocket costs that the plaintiffs have repeatedly conceded were legitimately imposed costs. Reading the 1998 GIP as a whole, the additional charges are "reasonable" and ancillary under *Reese*.

Some disagree with the Sixth Circuit's position in *Kelsey-Hayes* that *Reese* does not represent a major change in Sixth Circuit retiree benefits case law. S*ee, e.g., Reese v. CNH Indus. N.V.*, No. CV 04-CV-70592, 2015 WL 5679827 at n.1 (E.D. Mich. Sept. 28, 2015) ("[T]he *Reese* panels appear to have changed the definition of 'vested' inasmuch as they use that word to describe benefits that, while lasting for life, are subject to unilateral reduction. . . . Prior to those decisions, 'vested' benefits referred to benefits that last forever at a fixed level.") (collecting Sixth Circuit cases stating that a unilateral reduction or modification of "vested" benefits would violate the LMRA). Indeed, the Supreme Court has held that, "[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent.

The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed." *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n. 20 (1971). Nonetheless, although some might argue that *Reese*'s "reasonable changes" analysis is inconsistent with prior Sixth Circuit and Supreme Court precedent, it is not necessarily inconsistent with *Tackett*. Unless the Supreme Court or the Sixth Circuit itself overrules *Reese*, this court is bound to follow it, as it has done in this case.

In conclusion, the court finds no basis for reconsideration of its conclusion that, pursuant to *Reese*, Caterpillar's imposition of additional deductibles, co-insurance, and increased out-of-pocket costs were "reasonable" charges and, as such, permissible under ERISA and the LMRA. Accordingly, the court will deny the plaintiffs' motion to reconsider.

## CONCLUSION

For the foregoing reasons, the court will deny the motions to reconsider filed by Caterpillar (Docket No. 451) and Plaintiffs (Docket No. 464). All that remains of this litigation is to determine the plaintiffs' damages in a manner consistent with the court's rulings.

_____
ALETA TRAUGER
UNITED STATES DISTRICT JUDGE